# LOWE ET AL. v. SECURITIES AND EXCHANGE COMMISSION

No. 83–1911. Argued January 7, 1985—Decided June 10, 1985

182

STEVENS, J., delivered the opinion of the Court, in which BRENNAN, MARSHALL, BLACKMUN, and O'CONNOR, JJ., joined. WHITE, J., filed an opinion concurring in the result, in which BURGER, C. J., and REHNQUIST, J., joined, *post*, p. 211. POWELL, J., took no part in the decision of the case.

*Michael E. Schoeman* argued the cause and filed briefs for petitioners.

*Solicitor General Lee* argued the cause for respondent. With him on the brief were *Deputy Solicitor General Claiborne, Daniel L. Goelzer, Paul Gonson, Jacob H. Stillman, Alan Rosenblat, David A. Sirignano,* and *Gerard S. Citera.**

*Briefs of *amici curiae* urging reversal were filed for the American Federation of Labor and Congress of Industrial Organizations by *Robert M. Weinberg* and *Laurence Gold;* for the Association of American Publishers,

JUSTICE STEVENS delivered the opinion of the Court.

The question is whether petitioners may be permanently enjoined from publishing nonpersonalized investment advice and commentary in securities newsletters because they are not registered as investment advisers under § 203(c) of the Investment Advisers Act of 1940 (Act), 54 Stat. 850, 15 U. S. C. § 80b–3(c).

Christopher Lowe is the president and principal shareholder of Lowe Management Corporation. From 1974 until 1981, the corporation was registered as an investment adviser under the Act.[1] During that period Lowe was convicted of misappropriating funds of an investment client, of engaging in business as an investment adviser without filing a registration application with New York's Department of Law, of tampering with evidence to cover up fraud of an investment client, and of stealing from a bank.[2] Consequently, on May 11, 1981, the Securities and Exchange Commission (Commission), after a full hearing before an Administrative Law Judge, entered an order revoking the registration of the Lowe Management Corporation, and ordering Lowe not to associate thereafter with any investment adviser.

In fashioning its remedy, the Commission took into account the fact that petitioners "are now solely engaged in the business of publishing advisory publications." The Commission noted that unless the registration was revoked, petitioners

---

Inc., by *R. Bruce Rich;* and for the Reporters Committee for Freedom of the Press et al. by *Nancy J. Bregstein, Benjamin W. Boley,* and *Robert J. Brinkmann.*

*Michael R. Klein* filed a brief for the American Civil Liberties Union as *amicus curiae* urging affirmance.

*Harry F. Tepker, Jr.,* filed a brief for the North American Securities Administrators Association, Inc., as *amicus curiae.*

[1] *In re Lowe Management Corp.,* [1981 Transfer Binder] CCH Fed. Sec. L. Rep. ¶ 82,873, p. 84,321.

[2] *Id.,* at 84,321–84,323.

would be "free to engage in all aspects of the advisory business" and that even their publishing activities afforded them "opportunities for dishonesty and self-dealing."[3]

A little over a year later, the Commission commenced this action by filing a complaint in the United States District Court for the Eastern District of New York, alleging that Lowe, the Lowe Management Corporation, and two other corporations,[4] were violating the Act, and that Lowe was violating the Commission's order. The principal charge in the complaint was that Lowe and the three corporations (petitioners) were publishing two investment newsletters and soliciting subscriptions for a stock-chart service. The complaint alleged that, through those publications, the petitioners were engaged in the business of advising others "as to the advisability of investing in, purchasing, or selling securities . . . and as a part of a regular business . . . issuing reports concerning securities."[5] Because none of the petitioners was registered or exempt from registration under the Act, the use of the mails in connection with the advisory business allegedly violated § 203(a) of the Act. The Commission prayed for a permanent injunction restraining the further distribution of petitioners' investment advisory publications;

---

[3] The Commission wrote:

"We do not seek to punish respondents but, in light of their egregious misconduct, we must protect the public from the future harm at their hands. In evaluating the public interest requirements in this case, we have taken into account respondents' statement that they are now solely engaged in the business of publishing advisory publications. However, respondents are still free to engage in all aspects of the advisory business. And, as the Administrative Law Judge noted, even their present activities afford numerous 'opportunities for dishonesty and self-dealing.'

"Under all the circumstances, we are convinced that the public interest requires the revocation of registrant's investment adviser registration, and a bar of Lowe from association with any investment adviser." *Id.*, at 84,324.

[4] The other two corporations are the Lowe Publishing Corporation and the Lowe Stock Chart Service, Inc.

[5] App. 18.

for a permanent injunction enforcing compliance with the order of May 11, 1981; and for other relief.[6]

Although three publications are involved in this litigation, only one need be described. A typical issue of the Lowe Investment and Financial Letter contained general commentary about the securities and bullion markets, reviews of market indicators and investment strategies, and specific recommendations for buying, selling, or holding stocks and bullion. The newsletter advertised a "telephone hotline" over which subscribers could call to get current information. The number of subscribers to the newsletter ranged from 3,000 to 19,000. It was advertised as a semimonthly publication, but only eight issues were published in the 15 months after the entry of the 1981 order.[7]

Subscribers who testified at the trial criticized the lack of regularity of publication,[8] but no adverse evidence concerning the quality of the publications was offered. There was no evidence that Lowe's criminal convictions were related to the publications;[9] no evidence that Lowe had engaged in any

---

[6] *Id.*, at 23–26.

[7] *Id.*, at 32, 78–85. The Lowe Stock Advisory had only 278 paid subscribers and had published only four issues between May 1981 and its last issue in March 1982. It also analyzed and commented on the securities and bullion markets, but specialized in lower-priced stocks. Subscribers were advised that they could receive periodic letters with updated recommendations about specific securities and also could make use of the telephone hotline. 556 F. Supp. 1359, 1361 (EDNY 1983). Petitioners advertised the Lowe Chart Service as a weekly publication that would contain charts for all securities listed on the New York and American Stock Exchanges, and for the 1,200 most actively traded over-the-counter stocks, as well as charts on gold and silver prices and market indicators. Unlike the other two publications, it did not propose to offer any specific investment advice. Although there were approximately 40 subscribers, no issues were published. *Ibid.*; App. 32. The regular subscription rate was $325 for 3 months or $900 for 1 year.

[8] *Id.*, at 38, 42, 46, 58.

[9] In addition to the 1977 and 1978 convictions that gave rise to the Commission's 1981 order, in 1982, Lowe was convicted on two counts of theft by deception through the issuance of worthless checks. *Id.*, at 74–76.

trading activity in any securities that were the subject of advice or comment in the publications; and no contention that any of the information published in the advisory services had been false or materially misleading.[10]

For the most part, the District Court denied the Commission the relief it requested. 556 F. Supp. 1359, 1371 (EDNY 1983). The court did enjoin petitioners from giving information to their subscribers by telephone, individual letter, or in person, but it refused to enjoin them from continuing their publication activities or to require them to disgorge any of the earnings from the publications.[11] The District Court acknowledged that the face of the statute did not differentiate between persons whose only advisory activity is the "publication of impersonal investment suggestions, reports and analyses," and those who rendered person-to-person advice, but concluded that constitutional considerations suggested the need for such a distinction.[12] After determining that petitioners' publications were protected by the First Amendment, the District Court held that the Act must be construed to allow a publisher who is willing to comply with the existing reporting and disclosure requirements to register for the limited purpose of publishing such material and to engage in such publishing.[13]

A splintered panel of the Court of Appeals for the Second Circuit reversed. 725 F. 2d 892 (1984). The majority first

---

[10] 556 F. Supp., at 1361–1362.

[11] The District Court also rejected the Commission's claim that the publications were fraudulent because they did not disclose Lowe's criminal convictions or the revocation of the registration of Lowe Management Corporation, noting that the Commission had not promulgated any rules requiring such disclosure. *Id.*, at 1371.

[12] *Id.*, at 1365.

[13] *Id.*, at 1369. The District Court wrote: "When a publisher who has been denied registration or against whom sanctions have been invoked fully complies with the record, reporting and disclosure requirements under the Act, he must be allowed to register for the purpose of publishing and to publish." *Ibid.*

held that petitioners were engaged in business as "investment advisers" within the meaning of the Act. It concluded that the Act does not distinguish between person-to-person advice and impersonal advice given in printed publications.[14] Rather, in its view, the key statutory question was whether the exclusion in § 202(a)(11)(D), 15 U. S. C. § 80b–2(a)(11)(D), for "the publisher of any bona fide newspaper, news magazine, or business or financial publication of general and regular circulation" applied to the petitioners. Relying on its decision in *SEC* v. *Wall Street Transcript Corp.*, 422 F. 2d 1371, cert. denied, 398 U. S. 958 (1970), the Court of Appeals concluded that the exclusion was inapplicable.[15]

Next, the Court of Appeals rejected petitioners' constitutional claim, reasoning that this case involves "precisely the kind of regulation of commercial activity permissible under the First Amendment."[16] Moreover, it held that Lowe's history of criminal conduct while acting as an investment adviser justified the characterization of his publications "as potentially deceptive commercial speech."[17] The Court of Appeals reasoned that a ruling that petitioners "may not sell their views as to the purchase, sale, or holding of certain securities is no different from saying that a disbarred lawyer may not sell legal advice."[18] Finally, the court noted that its holding was limited to a prohibition against selling advice to clients about specific securities.[19] Thus, the Court of

---

[14] 725 F. 2d, at 896–897.

[15] *Id.*, at 898.

[16] *Id.*, at 900. The court additionally rejected petitioners' claim that "the Act violates equal protection by subjecting investment newsletters, but not bona fide newsletters, to regulation." *Id.*, at 900, n. 5.

[17] *Id.*, at 901.

[18] *Id.*, at 902.

[19] At the end of its opinion, the Court of Appeals wrote:

"Finally, we note what this holding does not entail. Lowe is not prohibited from publishing or stating his views as to any matter of current interest, economic or otherwise, such as the likelihood of war, the trend in interest rates, whether the next election will affect market conditions,

Appeals apparently assumed that petitioners could continue publishing their newsletters if their content was modified to exclude any advice about specific securities.[20]

One judge concurred separately, although acknowledging his agreement with the court's opinion.[21] The dissenting judge agreed that Lowe may not hold himself out as a registered investment adviser and may not engage in any fraudulent activity in connection with his publications, but concluded that the majority had authorized an invalid prior restraint on the publication of constitutionally protected speech. To avoid the constitutional question, he would have adopted the District Court's construction of the Act.[22]

## I

We granted certiorari to consider the important constitutional question whether an injunction against the publication

---

or whether future enforcement of the Anti-Dumping Act to protect basic American smokestack industry from foreign competition is likely. He is not prohibited from publishing a newspaper of general interest and circulation. Nor is he prohibited from publishing recommendations in somebody else's bona fide newspaper as an employee, editor, or writer. What he is prohibited from doing is selling to clients advice and counsel, analysis and reports as to the value of specific securities or as to the advisability of investing in, purchasing or selling or holding specific securities." *Ibid.* It appended the following footnote:

"We leave to another day the question whether a publication dealing only with market indicators generally or making recommendations only as to groups of securities (e. g., air transport, beverages-brewers, mobile homes) could be barred on facts such as those of this case." *Id.*, at 902, n. 7.

[20] The Court of Appeals did not explain whether its apparent unwillingness to grant the Commission all of the relief requested was based on its opinion that a modification in the content of the publication would avoid the statutory definition of "investment adviser" or on the assumption that petitioners have a constitutional right to publish newsletters omitting specific recommendations.

[21] *Id.*, at 902–903.

[22] *Id.*, at 903.

and distribution of petitioners' newsletters is prohibited by the First Amendment. 469 U. S. 815 (1984).[23] Petitioners contend that such an injunction strikes at the very foundation of the freedom of the press by subjecting it to license and censorship, see, *e. g.*, *Lovell* v. *City of Griffin*, 303 U. S. 444, 451 (1938). Brief for Petitioners 15–19. In response the Commission argues that the history of abuses in the securities industry amply justified Congress' decision to require the registration of investment advisers, to regulate their professional activities, and, as an incident to such regulation, to prohibit unregistered and unqualified persons from engaging in that business. Brief for Respondent 10; cf. *Konigsberg* v. *State Bar of California*, 366 U. S. 36, 50–51 (1961). In reply, petitioners acknowledge that person-to-person communication in a commercial setting may be subjected to regulation that would be impermissible in a public forum, cf. *Ohralik* v. *Ohio State Bar Assn.*, 436 U. S. 447, 455 (1978), but contend that the regulated class—investment advisers—may not be so broadly defined as to encompass the distribution of impersonal investment advice and commentary in a public market. Reply Brief for Petitioners 1–4.

In order to evaluate the parties' constitutional arguments, it is obviously necessary first to understand, as precisely as possible, the extent to which the Act was intended to regu-

---

[23] Petitioners' submission in this Court does not challenge the validity of the Commission's order revoking the registration of Lowe Management Corporation and barring Lowe from future association with an investment adviser. Section 203(e) of the Act, 15 U. S. C. § 80b–3(e), authorizes the Commission to revoke the registration of any investment adviser if it finds, after notice and an opportunity for hearing, that such revocation is in the public interest and that the investment adviser has committed certain types of crimes. Section 203(f), 15 U. S. C. § 80b–3(f), authorizes the Commission to bar the association of any person with an investment adviser if he has committed acts that would justify the revocation of an investment adviser's registration. Moreover, petitioners do not challenge the District Court's holding that they may not operate a direct "hot line" for subscribers desiring personalized advice.

late the publication of investment advice and the reasons that motivated Congress to authorize such regulation. Moreover, in view of the fact that we should "not decide a constitutional question if there is some other ground upon which to dispose of the case,"[24] and the further fact that the District Court and the dissenting judge in the Court of Appeals both believed that the case should be decided on statutory grounds, a careful study of the statute may either eliminate, or narrowly limit, the constitutional question that we must confront. We therefore begin with a review of the background of the Act with a particular focus on the legislative history describing the character of the profession that Congress intended to regulate.

## II

As we observed in *SEC* v. *Capital Gains Research Bureau, Inc.*, the "Investment Advisers Act of 1940 was the last in a series of acts designed to eliminate certain abuses in the securities industry, abuses which were found to have contributed to the stock market crash of 1929 and the depression of the 1930's."[25] The Act had its genesis in the Public Utility Holding Company Act of 1935, which "authorized and directed" the Commission "to make a study of the functions and activities of investment trusts and investment companies . . . and to report the results of its study and its recommendations to the Congress on or before January 4, 1937."[26] Pursuant to this instruction, the Commission transmitted to Congress its study on investment counsel, investment management, investment supervisory, and investment advisory services.[27]

---

[24] *Escambia County, Florida* v. *McMillan*, 466 U. S. 48, 51 (1984) *(per curiam);* see also *Atkins* v. *Parker, ante,* at 123; *Ashwander* v. *TVA*, 297 U. S. 288, 347 (1936) (Brandeis, J., concurring).

[25] 375 U. S. 180, 186 (1963) (footnote omitted).

[26] 49 Stat. 837.

[27] See Investment Trusts and Investment Companies, Report of the Securities and Exchange Commission, Pursuant to Section 30 of the Public

The Report focused on "some of the more important problems of these investment counsel organizations";[28] significantly, the Report stated that it "was intended to exclude any person or organization which was engaged in the business of furnishing investment analysis, opinion, or advice solely through publications distributed to a list of subscribers and did not furnish specific advice to any client with respect to securities."[29]

The Report traced the history and growth of investment counsel, noting that the profession did not emerge until after World War I.[30] In the 1920's "a distinct class of persons . . . held themselves out as giving only personalized investment advisory service"; rapid growth began in 1929, and markedly increased in the mid-1930's in response "to the demands of the investing public, which required supervision of its security investments after its experience during the depression years."[31]

---

Utility Holding Company Act of 1935, Investment Counsel, Investment Management, Investment Supervisory, and Investment Advisory Services, H. R. Doc. No. 477, 76th Cong., 2d Sess. (1939) (hereinafter cited as Report).

[28] *Id.*, at III.

[29] *Id.*, at 1.

[30] *Id.*, at 3.

[31] *Id.*, at 5. After detailing the geographic distribution, the forms, and the sizes of investment-counsel firms, the Report analyzed the affiliations of the firms. It noted that "[a]ll investment counsel firms have not restricted their business interests or activities to the supervision of the accounts of their investment clients." *Id.*, at 11. Of the investment-counsel firms surveyed, approximately 5% published investment manuals and periodicals; of these latter firms, 80% were without investment-company clients. *Ibid.* The Commission posited that affiliations with publishers of investment manuals and periodicals "may be attributable to the fact that research and statistical organizations are not uncommon with these businesses." *Id.*, at 12. The Report also analyzed the nature of services of investment-counsel firms to their clients:

"The powers of investment counsel firms with respect to the management of the funds of their investment company clients were either dis-

Regarding the functions of investment counselors, the Report stated that "[s]ome of the representatives of investment counsel firms urged that the primary function of investment counselors was 'to render to clients, on a personal basis, competent, unbiased, and continuous advice regarding the sound management of their investments.'"[32] Nevertheless, it noted that one investment counselor conceded:

"[Y]ou have a gradation from individuals who are professed tipsters and do not make any pretense of being anything else, all the way up the scale to the type of individual, who, as you say, desires to give the impartial scientific professional advice to persons who are trying to plan their economic situation in the light of accomplishing various results, making provision for old age, education, and so forth. However, you can readily see . . . that a very significant part of that problem, as far as we are concerned, and possibly the most vital one, is, shall we say, the individuals on the fringes. . . ."[33]

Representatives of the industry viewed the functions of investment counselors slightly differently, concluding that they should serve "individuals and institutions with substantial funds who require continuous supervision of their investments and a program of investment to cover their entire eco-

---

cretionary or advisory. Discretionary powers imply the vesting with an investment counsel firm control over the client's funds, with the power to make the ultimate determination with respect to the sale and purchase of securities for the client's portfolio. In contrast, vesting advisory powers with an investment counsel firm merely means that the firm may make recommendations to its client, with whom rests the ultimate power to accept or reject such recommendations." *Id.*, at 13.

Approximately one-third of the firms surveyed had discretionary powers, *ibid.;* however, all firms surveyed rarely assumed "custody of the portfolio securities of their investment company clients," *id.*, at 15.

[32] *Id.*, at 23.

[33] *Id.*, at 25.

nomic needs."[34] Turning to the problems of investment counselors, the Report concluded that they fell within two categories: "(a) the problem of distinguishing between bona fide investment counselors and 'tipster' organizations; and (b) those problems involving the organization and operation of investment counsel institutions."[35]

---

[34] *Ibid.* Moreover, the representatives pointed out that there was a difference between the functions of investment counselors and investment companies:

". . . [T]he ordinary investment trust of the management type gives its holder a diversification, probably beyond the ability of the small investor to obtain on his own capital. It also gives him management. It does not take any cognizance—the distinction is that it takes no cognizance of his total financial position in investing his money for him, and is distinguished from investment counsel, in that it gives him no judgment in the matter whatever. . . .

"Q. *Now, you say the true function as you conceive it, of an investment counselor, is to give advice in connection with the specific condition of a particular individual?*

"A. *Yes.*

"Q. *While the investment trust does not have that personal element in it, that it manages the funds more on an impersonal basis?*

"A. *That is right.*

"Q. 'Impersonal' being used in the sense that they may try to get a common denominator, or what they envision their stockholders' condition may be, or what would be best for a cross-section of the American public, but does not give the advice with the peculiar, particular, specific financial condition of the individual and what he hopes to accomplish, or what purpose.

"A. Might I also add that in a number of cases at least, as Mr. Dunn said yesterday, the investment trust managers do not consider their funds as a proper repository for all of an individual's capital. It is not that it doesn't consider only his personal peculiarities and needs, but it does not give him a complete financial program." *Id.*, at 26–27 (testimony of James N. White of Scudder, Stevens & Clark) (emphasis added).

[35] *Id.*, at 27. Moreover, industry representatives "felt that investment counsel organizations could not completely perform their basic function—furnishing to clients on a personal basis competent, unbiased, and continuous advice regarding the sound management of their investments—unless

The Commission's work "culminated in the preparation and introduction by Senator Wagner of the bill which, with some changes, became the Investment Advisers Act of 1940."[36] Senator Wagner's bill, S. 3580, contained two Titles; the first, concerning investment companies, contained a definition of "investment adviser,"[37] but the second, concerning investment advisers, did not. After the introduction of S. 3580, a Senate Subcommittee held lengthy hearings at which numerous statements concerning investment advisers

---

all conflicts of interest between the investment counsel and the client were removed." *Id.*, at 28. The Report, near its conclusion, summarized:

"It was the unanimous opinion of the representatives at the public examination . . . that, although a voluntary organization would serve some salutary purpose, such an organization could not cope with the most elemental and fundamental problem of the investment counsel industry—the investment counsel 'fringe' which includes those incompetent and unethical individuals or organizations who represent themselves as bona fide investment counselors. These individuals and organizations not only could not meet the requirements of membership, but because of the nature of their activities would not even consider voluntarily submitting to supervision or policing." *Id.*, at 34.

[36] *SEC* v. *Capital Gains Research Bureau, Inc.*, 375 U. S., at 189.

[37] S. 3580 contained the following definition of "investment adviser":

"'Investment adviser' means any person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing or selling securities, or who, for compensation and as part of a regular business, issues or promulgates analyses or reports concerning securities; but does not include (A) a bank; (B) any lawyer, accountant, engineer, or teacher whose performance of such services is solely incidental to the practice of his profession; (C) the publisher of any bona fide newspaper or newsmagazine of general circulation; or (D) such other persons, not within the intent of this paragraph, as the Commission may designate by rules and regulations or order." Hearings on S. 3580 before the Subcommittee on Securities and Exchange of the Senate Committee on Banking and Currency, 76th Cong., 3d Sess., pt. 1, p. 27 (1940) (Senate Hearings).

It is noteworthy that the exclusion for publishers in clause (C) in S. 3580 is not as broad as the exclusion in the final draft of the Act. See n. 43, *infra*.

were received.[38] One witness distinguishing the investment-counsel profession from investment firms and businesses, explained:

> "*It is a personal-service profession and depends for its success upon a close personal and confidential relationship between the investment-counsel firm and its client. It requires frequent and personal contact of a professional nature between us and our clients. . . .*
>
> . . . . .
>
> "*We must establish with each client a relationship of trust and confidence designed to last over a period of*

---

[38] Douglas T. Johnston, Vice President of the Investment Counsel Association of America, stated in part:

"The definition of 'investment adviser' as given in the bill, in spite of certain exclusions, is quite broad and covers a number of services which are entirely different in their scope and in their methods of operation. For example, as we read the definition, among others, it would include those companies which publish manuals of securities such as Moody's, Poor's, and so forth; it would include those companies issuing weekly investment letters such as Babson's, United Business Service, Standard Statistics, and so forth; it would include those tipsters who through newspaper advertisements offer to send, for a nominal price, a list of stocks that are sure to go up; it would include certain investment banking and brokerage houses which maintain investment advisory departments and make charges for services rendered; and finally it would include those firms which operate on a professional basis and which have come to be recognized as investment counsel.

"Just why it is thought to be in the public interest at this time to require all the above services to register with, and be regulated by, the Federal Government we do not know.

. . . . .

"I have mentioned certain important exceptions or exclusions in the definition of 'investment advisers'; one of the principal of these is lawyers. Probably in the aggregate more investment advice is given by lawyers than by all other advisers combined. I only want to point out that in so acting they are not functioning strictly as lawyers. So far as I know, no courses on investments are part of a law school curriculum, nor in passing bar examinations does a lawyer have to pass a test on investment." Senate Hearings 711–712.

196

*time because economic forces work themselves out
slowly.* Business and investment cycles last for years
and our investment plans have to be similarly long-
range. No investment counsel firm could long remain in
business or be of real benefit to clients except through
such long-term associations. . . .

". . . Judgment of the client's circumstances and of the
soundness of his financial objectives and of the risks he
may assume. Judgment is the root and branch of the
decisions to recommend changes in a client's security
holdings. If the investment counsel profession, as we
have described it, could not offer this kind of judgment
with its supporting experience and information, it would
not have anything to sell that could not be bought in
almost any bookstore. . . .

"Furthermore, our clients are not unsophisticated in
financial matters. They are resourceful men and
women of means who are very critical in their examina-
tion of our performance. If they disapprove of our
activities, they cancel their contracts with us, which
eliminates our only source of income.

. . . . .

"We are quite clearly not 'hit and run' tipsters, nor do
we deal with our clients at arms' length through the
advertising columns of the newspapers or the mails; in
fact, we regard it as a major defeat if we are unable
to have frequent personal contact with a client and with
his associates and dependents. We do not publish for
general distribution a statistical service or compendium
of general economic observations or financial recommen-
dations. To use a hackneyed phrase, our business is
'tailor-made.'" [39]

---

[39] *Id.*, at 713–716 (testimony of Charles M. O'Hearn) (emphasis added);
see also *id.*, at 719 ("The relationship of investment counsel to his client is
essentially a personal one involving trust and confidence. The investment
counselor's sole function is to render to his client professional advice con-
cerning the investment of his funds in a manner appropriate to that client's

David Schenker, Chief Counsel of the Commission's Investment Trust Study, summarized the extent of the proposed legislation: "If you have been convicted of a crime, you cannot be an investment counselor and you cannot use the mails to perpetrate a fraud," Senate Hearings 996. Schenker provided the Subcommittee with a significant report[40] prepared by the Research Department of the Illinois Legislative Council. *Ibid.* Referring to possible regulation of investment counselors in the State of Illinois, the report stated in part:

> "Regulatory statutes concerning investment counselors appear to exempt from their provisions those who furnish advice without remuneration or valuable consideration, apparently because it is thought impracticable to regulate such gratuitous services. Newspapers and journals generally also seem to be excluded although this is not explicitly stated in the statutes, the exemption apparently being based on general constitutional and legal principles.

> . . . . .

needs") (statement of Alexander Standish); *id.*, at 724 (the "function of rendering to clients—on a personal, professional basis—competent, unbiased, and continuous advice regarding the sound management of their investments, has had a steady growth") (statement of Dwight C. Rose, President, Investment Counsel Association of America); *id.*, at 750 ("Investment counsel have sprung into being in response to the requirements of individuals for individual personal advice with respect to the handling of their affairs . . . the whole genesis of investment counseling is a personal professional relationship") (testimony of Rudolf P. Berle, General Counsel, Investment Counsel Association of America).

[40] It should be noted that the Illinois report was submitted by Schenker on April 26, 1940, more than three weeks after the statement quoted by JUSTICE WHITE, *post*, at 219. Contrary to JUSTICE WHITE's suggestion, there is nothing in the legislative history to indicate that Congress rejected the report's proposed distinction between advice distributed solely "to a list of subscribers" and advice to "clients." It is undisputed that Congress broadened the scope of the "bona fide publications" exclusion after the Commission submitted the Illinois report. See n. 37, *supra*, and n. 43, *infra*.

*"A particular problem in defining the application of a law regulating investment counselors arises from the existence of individuals and firms who furnish investment advice solely by means of publications.* Insofar as such individuals and firms also render specialized advice to individual clients, they might be subject to any regulatory measure that may be adopted.* The question arises, however, as to whether or not services which give the same general advice to all their clients, by means of some circular or other publication, are actually engaged in a type of investment counseling as to which regulation is feasible.

. . . . .

"These investment services which function through publications sent to their subscribers, rather than through individualized advice, would present several difficulties not found in regulating investment counselors generally. In the first place, the large number of agencies publishing investment facts and interpretations is well known, and a very large administrative staff would be required to enforce detailed registration. Secondly, such information is supplied both by newspapers and by specialized financial journals and services. *The accepted rights of freedom of the press and due process of law might prevent any general regulation and perhaps also supervision over particular types of publications, even if the advertisements of these publications occasionally quite exaggerate the value of the factual information which is supplied.* That the constitutional guarantee of liberty of the press is applicable to publications of all types, and not only to newspapers, has been clearly indicated by the United States Supreme Court* [citing *Lovell* v. *City of Griffin,* 303 U. S. 444 (1938)]. . . .

. . . . .

"To the problem of formulating reasonable and practicable regulations for the factual services must, accordingly, be added the legal and constitutional difficulties inherent in the attempted regulation of any individual or

organization functioning primarily by means of published circulars and volumes. However, liberty of the press is not an absolute right, and some types of regulation may be both constitutional and feasible, assuming that regulation of some sort is thought desirable. Such regulation could probably not legally take the form of licensing publications or prohibiting certain types of publications. Regulation of the publishing of investment advice in order to conform with constitutional requirements, would probably have to be confined to punishing, by civil or criminal penalties, those who perpetrate or attempt to perpetrate frauds or other specific acts declared to be contrary to law.

*"It may be thought desirable specifically to exclude from regulation the publishers of generalized investment information, along with those who furnish economic advice generally. This may be done by carefully defining the term 'investment counselor' so as to exclude 'any person or organization which engages in the business of furnishing investment analysis, opinion, or advice solely through publications distributed to a list of subscribers and not furnishing specific advice to any client with respect to securities, and also persons or organizations furnishing only economic advice and not advice relating to the purchase or sale of securities.'"* [41]

After the Senate Subcommittee hearings on S. 3580, and after meetings attended by representatives of investment-adviser firms, a voluntary association of investment advisers, and the Commission, a revised bill, S. 4108, was reported by the Senate Committee on Banking and Currency. In the Report accompanying the revised bill, the Committee on Banking and Currency wrote:

"Not only must the public be protected from the frauds and misrepresentations of unscrupulous tipsters and

---

[41] *Id.*, at 1007–1009 (emphasis added) (footnotes omitted).

touts, but the bona fide investment adviser must be safe-guarded against the stigma of the activities of these individuals. Virtually no limitations or restrictions exist with respect to the honesty and integrity of individuals who may solicit funds to be controlled, managed, and supervised. Persons who may have been convicted or enjoined by courts because of perpetration of securities fraud are able to assume the role of investment advisers.

. . . . .

*"Title II recognizes that with respect to a certain class of investment advisers, a type of personalized relationship may exist with their clients. As a consequence, this relationship is a factor which should be considered in connection with the enforcement by the Commission of the provisions of this bill."* [42]

S. 4108 was introduced before the House of Representatives as H. R. 10065.[43] After additional hearings,[44] the

---

[42] S. Rep. No. 1775, 76th Cong., 3d Sess., 21–22 (1940) (emphasis added).

[43] Hearings on H. R. 10065 before a Subcommittee of the House Committee on Interstate and Foreign Commerce, 76th Cong., 3d Sess., 1 (1940). The bill contained two definitions of "investment adviser," one in Title I (investment companies) and the other in Title II (investment advisers). The latter definition read, in part:

" 'Investment adviser' means any person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities, or who, for compensation and as part of a regular business, issues or promulgates analyses or reports concerning securities; but does not include . . . (D) the publisher of any bona fide newspaper, news magazine or business or financial publication of general and regular circulation. . . ." *Id.*, at 45.

Whereas the exclusion for publishers in clause (C) of the exclusion in S. 3580 only mentioned newspapers of general circulation, the exclusion in clause (D) of H. R. 10065 includes newspapers "of general and regular circulation" and also encompasses "business or financial" publications. See n. 37, *supra.*

[44] Hearings on H. R. 10065 before a Subcommittee of the House Committee on Interstate and Foreign Commerce, 76th Cong., 3d Sess.

Committee on Interstate and Foreign Commerce wrote in its Report accompanying the bill:

> "The essential purpose of Title II of this bill is to protect the public from the frauds and misrepresentations of unscrupulous tipsters and touts and to safeguard the honest investment adviser against the stigma of the activities of these individuals by making fraudulent practices by investment advisers unlawful. *The title also recognizes the personalized character of the services of investment advisers and especial care has been taken in the drafting of the bill to respect this relationship between investment advisers and their clients.*"[45] (Emphasis added.)

---

(1940). During the hearings, testimony about the personal nature of the investment-counseling profession was again emphasized:

"When the hearings were held on this bill before the Senate committee the association opposed it. We opposed it for three general reasons: First, in the original bill there was a confusion between investment counsel and investment trusts. We felt that the personal confidential relationship existing between investment counsel and his client was so very different from the commodity of investment trust shares which investment trusts were engaged in selling, that any legislation to regulate these two different activities should be incorporated in separate acts. In the bill we felt that our clients were not properly protected in their confidential relationship. . . .

. . . . .

"Following the hearings before the Senate subcommittee, we had conferences with the Securities and Exchange Commission, and all of our objections have been satisfactorily adjusted. . . .

. . . . .

"The Investment Counsel Association of America unqualifiedly endorses the present bill." *Id.*, at 92 (statement of Dwight Rose, representing Investment Counsel Association of America, New York, N. Y.).

[45] H. R. Rep. No. 2639, 76th Cong., 3d Sess., 28 (1940). The terms "investment counsel," "investment counselor," and "investment adviser" were used interchangeably throughout the legislative history. That the terms were understood to share a common definition is best demonstrated by the testimony of the Commission's David Schenker. While describing the Commission's initial report to Congress, he stated that "we learned of the existence of 394 investment counselors." Senate Hearings 48. On

The definition of "investment adviser" included in Title II when the Act was passed, 54 Stat. 848–849, is in all relevant respects identical to the definition before the Court today.[46]

---

the very next page of the hearings, he stated that "we learned of the existence of 394 investment advisers." *Id.*, at 49. JUSTICE WHITE, however, *post*, at 221–223, n. 7, correctly observes that the statutory definition of an "adviser" encompasses persons who would not qualify as investment counsel because they are not primarily engaged in the business of rendering "*continuous* advice as to the investment of funds. . . ." 15 U. S. C. § 80b–2(a)(13) (emphasis added). But it does not follow, as JUSTICE WHITE seems to assume, that the term "investment adviser" includes persons who have no personal relationship at all with their customers. The repeated use of the term "client" in the statute, see n. 54, *infra*, contradicts the suggestion that a person who is merely a publisher of nonfraudulent information in a regularly scheduled periodical of general circulation has the kind of fiduciary relationship the Act was designed to regulate.

[46] According to JUSTICE WHITE, witness James White "specifically explained to Representative Boren that persons whose advice was furnished solely through publications were *not* excepted from the class of investment advisers as defined in the Act." *Post*, at 220 (emphasis in original). This is incorrect. Representative Boren asked a question based on his reading of the separate definition of "investment adviser" in Title I, which concerned investment companies. In response, White indicated to Boren that he was reading the wrong definition; White then quoted the basic definition of "investment adviser" from Title II, and only answered the question whether there were separate definitions under the two Titles. The relevant colloquy reads as follows:

"Mr. Boren: If I read the bill correctly, a person whose advice is furnished solely through publications distributed through subscribers in the form of publications, they are specifically exempted.

"Now, should that person be exempted who puts out a monthly or weekly newspaper, we will say, advising people on that?

"Mr. White. Will you be kind enough to give the page from which you are reading?

"Mr. Boren. Well, it is on page 154. I am reading from page 12, in the definitions of investment advisers *from this other bill*. It is a little different in page numbers in this bill.

"Mr. Healy. May I suggest that there is a second definition.

"Mr. White. *That is an investment adviser of an investment company, which is different from an investment adviser in title II.*

## III

The basic definition of an "investment adviser" in the Act reads as follows:

"'Investment adviser' means any person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities, or who, for compensation and as part of a regular business, issues or promulgates analyses or reports concerning securities. . . ." [47]

Petitioners' newsletters are distributed "for compensation and as part of a regular business" and they contain "analyses or reports concerning securities." Thus, on its face, the

---

"Mr. Boren. I see.

"Mr. White [reading the definition from the bill]. An investment adviser in title II means any person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities, or who for compensation and as part of a regular business, issues or promulgates analyses or reports concerning securities.

"Mr. Boren. Then there is a distinct separation of investment advisers under the two different sections of the bill.

"Mr. White. Yes.

"Mr. Boren. Then that clarifies it for me, Mr. Chairman. I thank you.

"Mr. Cole. I believe that is all, Mr. White. Thank you.

"Mr. White. Thank you." Hearings on H. R. 10065, *supra*, at 90–91 (emphasis added).

It should also be noted that the last item from the 1940 legislative history that JUSTICE WHITE uses to support his interpretation of the Act is language from S. Rep. No. 1775. See *post*, at 221. The language should be read in the context of all the legislative history, and particularly in the context of H. R. Rep. No. 2639, which followed S. Rep. No. 1775 and which accompanied the final version of the Act before passage. The later Report stated unambiguously: "The title . . . recognizes the personalized character of the services of investment advisers." H. R. Rep. No. 2639, at 28.

[47] 15 U. S. C. § 80b–2(a)(11).

basic definition applies to petitioners. The definition, however, is far from absolute. The Act excludes several categories of persons from its definition of an investment adviser, lists certain investment advisers who need not be registered, and also authorizes the Commission to exclude "such other person" as it may designate by rule or order.[48]

One of the statutory exclusions is for "the publisher of any bona fide newspaper, news magazine or business or financial publication of general and regular circulation."[49] Although neither the text of the Act nor its legislative history defines the precise scope of this exclusion, two points seem tolerably clear. Congress did not intend to exclude publications that are distributed by investment advisers as a normal part of the business of servicing their clients. The legislative history plainly demonstrates that Congress was primarily interested in regulating the business of rendering personalized investment advice, including publishing activities that are a normal incident thereto. On the other hand, Congress, plainly sensitive to First Amendment concerns, wanted to make clear that it did not seek to regulate the press through the licensing of nonpersonalized publishing activities.

Congress was undoubtedly aware of two major First Amendment cases that this Court decided before the enactment of the Act. The first, *Near* v. *Minnesota ex rel. Olson*, 283 U. S. 697 (1931), established that "liberty of the press, and of speech, is within the liberty safeguarded by the due process clause of the Fourteenth Amendment from invasion by state action." *Id.*, at 707. In *Near*, the Court emphatically stated that the "chief purpose" of the press guarantee was "to prevent previous restraints upon publication," *id.*, at 713, and held that the Minnesota nuisance statute at issue in that case was unconstitutional because it authorized a prior restraint on publication.

Almost seven years later, the Court decided *Lovell* v. *City of Griffin*, 303 U. S. 444 (1938), a case that was expressly

---

[48] §§ 80b–2(a)(11)(F), 80b–3(b), 80b–6a.

[49] § 80b–2(a)(11)(D).

noted by the Commission during the Senate Subcommittee hearings. In striking down an ordinance prohibiting the distribution of literature within the city without a permit, the Court wrote:

"We think that the ordinance is invalid on its face. Whatever the motive which induced its adoption, its character is such that it strikes at the very foundation of the freedom of the press by subjecting it to license and censorship. The struggle for the freedom of the press was primarily directed against the power of the licensor. It was against that power that John Milton directed his assault by his 'Appeal for the Liberty of Unlicensed Printing.' And the liberty of the press became initially a right to publish '*without* a license what formerly could be published only *with* one.' While this freedom from previous restraint upon publication cannot be regarded as exhausting the guaranty of liberty, the prevention of that restraint was a leading purpose in the adoption of the constitutional provision. . . .

"The liberty of the press is not confined to newspapers and periodicals. It necessarily embraces pamphlets and leaflets. These indeed have been historic weapons in the defense of liberty, as the pamphlets of Thomas Paine and others in our own history abundantly attest. The press in its historic connotation comprehends every sort of publication which affords a vehicle of information and opinion. What we have had recent occasion to say with respect to the vital importance of protecting this essential liberty from every sort of infringement need not be repeated. *Near* v. *Minnesota*. . . ." *Id.*, at 451–452 (emphasis in original) (footnote omitted).

The reasoning of *Lovell*, particularly since the case was cited in the legislative history, supports a broad reading of the exclusion for publishers.[50]

---

[50] "It is always appropriate to assume that our elected representatives, like other citizens, know the law." *Cannon* v. *University of Chicago*, 441

The exclusion itself uses extremely broad language that encompasses any newspaper, business publication, or financial publication provided that two conditions are met. The publication must be "bona fide," and it must be "of regular and general circulation." Neither of these conditions is defined, but the two qualifications precisely differentiate "hit and run tipsters" and "touts" from genuine publishers. Presumably a "bona fide" publication would be genuine in the sense that it would contain disinterested commentary and analysis as opposed to promotional material disseminated by a "tout." Moreover, publications with a "general and regular" circulation would not include "people who send out bulletins from time to time on the advisability of buying and selling stocks," see Hearings on H. R. 10065, at 87, or "hit and run tipsters." [51] *Ibid.* Because the content of petitioners' newsletters was completely disinterested, and because they were offered to the general public on a regular schedule, they are described by the plain language of the exclusion.

The Court of Appeals relied on its opinion in *SEC* v. *Wall Street Transcript Corp.*, 422 F. 2d 1371 (CA2), cert. denied,

---

U. S. 677, 696–697 (1979). Moreover, "[i]n areas where legislation might intrude on constitutional guarantees, we believe that Congress, which has always sworn to protect the Constitution, would err on the side of fundamental constitutional liberties when its legislation implicates those liberties." *Regan* v. *Time, Inc.*, 468 U. S. 641, 697 (1984) (STEVENS, J., concurring in part and dissenting in part).

[51] The term "tipsters" is explained in the testimony of Douglas T. Johnston, n. 38, *supra*—persons "who through newspaper advertisements offer to send, for a nominal price, a list of stocks that are sure to go up." JUSTICE WHITE is unable "to imagine" any workable definition of the exclusion "that does not sweep in all publications that are not personally tailored to individual clients," *post*, at 216. The definition Congress actually wrote, however, does not sweep in bulletins that are issued from time to time in response to episodic market activity, advertisements that "tout" particular issues, advertised lists of stocks "that are sure to go up" that are sold to individual purchasers, or publications distributed as an incident to personalized investment service.

398 U. S. 958 (1970), to hold that petitioners were not bona fide newspapers and thus not exempt from the Act's registration requirement. In *Wall Street Transcript*, the majority held that the "phrase 'bona fide' newspapers . . . means those publications which do not deviate from customary newspaper activities to such an extent that there is a likelihood that the wrongdoing which the Act was designed to prevent has occurred." It reasoned that whether "a given publication fits within this exclusion must depend upon the nature of its practices rather than upon the purely formal 'indicia of a newspaper' which it exhibits on its face and in the size and nature of its subscription list." 422 F. 2d, at 1377. The court expressed its concern that an investment adviser "might choose to present [information to clients] in the guise of traditional newspaper format." *Id.*, at 1378. The Commission, citing *Wall Street Transcript*, has interpreted the exclusion to apply "only where, based on the content, advertising material, readership and other relevant factors, a publication is not primarily a vehicle for distributing investment advice." [52]

These various formulations recast the statutory language without capturing the central thrust of the legislative history, and without even mentioning the apparent intent of Congress to keep the Act free of constitutional infirmities. [53] The Act was designed to apply to those persons

---

[52] Investment Advisers Act Release No. 563, 42 Fed. Reg. 2953, n. 1 (1977) (codified at 17 CFR § 276 (1984)). The Commission's reformulation of the definition of the exclusion was not drafted until 1977—37 years after the passage of the Act—and therefore is not entitled to the deference due a contemporaneous construction of the Act. *SEC* v. *Sloan*, 436 U. S. 103, 117 (1978). JUSTICE WHITE attaches significance to the fact that in the first year of the Act's operation, 165 publishers of investment advisory services registered under the Act. *Post*, at 215. The fact that those firms deemed it advantageous to register does not demonstrate that the statute required them to do so.

[53] The Commission's focus on the content of the publication to determine whether a publisher is within the exclusion represents a dramatic depar-

engaged in the investment-advisory profession—those who provide personalized advice attuned to a client's concerns, whether by written or verbal communication.[54] The mere fact that a publication contains advice and comment about specific securities does not give it the personalized character that identifies a professional investment adviser. Thus, petitioners' publications do not fit within the central purpose of the Act because they do not offer individualized advice attuned to any specific portfolio or to any client's particular needs. On the contrary, they circulate for sale to the public at large in a free, open market—a public forum in which typically anyone may express his views.

The language of the exclusion, read literally, seems to describe petitioners' newsletters. Petitioners are "publishers of any bona fide newspaper, news magazine or business or financial publication." The only modifier that might arguably disqualify the newsletters are the words "bona fide." Notably, however, those words describe the publication rather than the character of the publisher; hence Lowe's unsavory history does not prevent his newsletters from being "bona fide." In light of the legislative history, this phrase translates best to "genuine"; petitioners' publications meet

---

ture from the objective criteria in the statute itself. As far as content is concerned, the statutory exclusion broadly encompasses every "business or financial publication" but then limits the category by a requirement that it be "bona fide," and a further requirement that it be "of general and regular circulation." JUSTICE WHITE makes no attempt to explain the meaning of either of these requirements, post, at 215–216, but, instead, merely emphasizes the breadth of the basic definition of an investment adviser, post, at 216–219, which admittedly is broad enough to encompass publishers. However, the basic definition must be read together with the exclusion in order to locate the place where Congress drew the line; in other words, we must give effect to every word that Congress used in the statute.

[54] It is significant that the Act repeatedly refers to "clients," not "subscribers." See, e. g., 15 U. S. C. §§ 80b–1(1), 80b–3(b)(1), 80b–3(b)(2), 80b–3(b)(3), 80b–3(c)(1)(E), 80b–6(1), 80b–6(2), 80b–6(3).

this definition: they are published by those engaged solely in the publishing business and are not personal communictions masquerading in the clothing of newspapers, news magazines, or financial publications. Moreover, there is no suggestion that they contained any false or misleading information, or that they were designed to tout any security in which petitioners had an interest. Further, petitioners' publications are "of general and regular circulation."[55] Although the publications have not been "regular" in the sense of consistent circulation, the publications have been "regular" in the sense important to the securities market: there is no indication that they have been timed to specific market activity, or to events affecting or having the ability to affect the securities industry.[56]

---

[55] JUSTICE WHITE relies on the testimony of witness James White to support his interpretation of the legislative history. *Post,* at 219–220. However, significantly, White stated that the term "investment adviser" includes *"people who send out bulletins from time to time on the advisability of buying or selling stocks."* Such people would not fit within the exclusion for bona fide publications of regular and general circulation. Tipsters who send out bulletins from time to time on the advisability of buying or selling stocks presumably would not satisfy the requirement of "general and regular circulation" and would fall within the basic definition of investment adviser. Thus, we do not agree with JUSTICE WHITE's assumption that petitioners should be equated with distributors of "tout sheets," *post,* at 217, n. 3. Additionally, it is extremely doubtful that any "tipsheet" or "tout sheet" could be a "bona fide," *i. e.,* genuine, publication so as to claim the benefits of the exclusion.

[56] Without actually determining how the exception is "supposed to mesh" with the basic definition, *post,* at 215, and without any consideration of the "general and regular" publication requirement, JUSTICE WHITE would adopt an extremely narrow, content-based, interpretation of the exclusion in order to preserve the Commission's ability to deal with the practice of "scalping," *post,* at 224. That practice is, of course, most dangerous when engaged in by a publication with a large circulation—perhaps by a columnist in an admittedly exempt publication. Cf. *Zweig* v. *Hearst Corp.,* 594 F. 2d 1261 (CA9 1979). Moreover, it is incorrect to assume that the only remedies against scalping are found in the Act. The mail-fraud statute

The dangers of fraud, deception, or overreaching that motivated the enactment of the statute are present in personalized communications but are not replicated in publications that are advertised and sold in an open market.[57] To the extent that the chart service contains factual information about past transactions and market trends, and the newsletters contain commentary on general market conditions, there can be no doubt about the protected character of the communications,[58] a matter that concerned Congress when the exclusion was drafted. The content of the publications and the audience to which they are directed in this case reveal the specific limits of the exclusion. As long as the communications between petitioners and their subscribers remain entirely impersonal and do not develop into the kind of fiduciary, person-to-person relationships that were discussed at length in the legislative history of the Act and that are characteristic of investment adviser-client relationships, we believe the publications are, at least presumptively, within the exclusion and thus not subject to registration under the Act.[59]

---

would certainly be available for many violations, and the SEC has recently had success using Rule § 10b–5 against a newsletter publisher. See *SEC* v. *Blavin*, 557 F. Supp. 1304 (ED Mich. 1983), aff'd, 760 F. 2d 706 (CA6 1985).

[57] Cf. *Ohralik* v. *Ohio State Bar`Assn.*, 436 U. S. 447 (1978). It is significant that the Commission has not established that petitioners have had authority over the funds of subscribers; that petitioners have been delegated decisionmaking authority to handle subscribers' portfolios or accounts; or that there have been individualized, investment-related interactions between petitioners and subscribers.

[58] Moreover, because we have squarely held that the expression of opinion about a commercial product such as a loudspeaker is protected by the First Amendment, *Bose Corp.* v. *Consumers Union of U. S., Inc.*, 466 U. S. 485, 513 (1984), it is difficult to see why the expression of an opinion about a marketable security should not also be protected.

[59] The Commission suggests that an investment adviser may regularly provide, in newsletter form, advice to several clients based on recent developments, without tailoring the advice to each client's individual

We therefore conclude that petitioners' publications fall within the statutory exclusion for bona fide publications and that none of the petitioners is an "investment adviser" as defined in the Act. It follows that neither their unregistered status, nor the Commission order barring Lowe from associating with an investment adviser, provides a justification for restraining the future publication of their newsletters. It also follows that we need not specifically address the constitutional question we granted certiorari to decide.

The judgment of the Court of Appeals is reversed.

*It is so ordered.*

JUSTICE POWELL took no part in the decision of this case.

JUSTICE WHITE, with whom THE CHIEF JUSTICE and JUSTICE REHNQUIST join, concurring in the result.

The issue in this case is whether the Securities and Exchange Commission may invoke the injunctive remedies of the Investment Advisers Act, 15 U. S. C. §§ 80b–1 to 80b–21, to prevent an unregistered adviser from publishing newsletters containing investment advice that is not specifically tailored to the needs of individual clients. The Court holds that it may not because the activities of petitioner Lowe (hereafter petitioner) do not make him an investment adviser covered by the Act. For the reasons that follow, I disagree with this improvident construction of the statute. In my view, petitioner is an investment adviser subject to regulation and sanction under the Act. I concur in the judgment, however, because to prevent petitioner from publishing at all is inconsistent with the First Amendment.

---

needs, and that this is the practice of investment advising. Brief for Respondent 34, n. 44. However, the Commission does not suggest that this "practice" is involved here; thus, we have no occasion to address this concern.

I

A

I have no quarrel with the principle that constitutional adjudication is to be avoided where it is fairly possible to do so without negating the intent of Congress. Due respect for the Legislative Branch requires that we exercise our power to strike down its enactments sparingly. For this reason, "[w]hen the validity of an act of the Congress is drawn in question, and even if a serious doubt of constitutionality is raised, it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided." *Crowell* v. *Benson*, 285 U. S. 22, 62 (1932).

But our duty to avoid constitutional questions through statutory construction is not unlimited: it is subject to the condition that the construction adopted be "fairly possible." As Chief Justice Taft warned, "amendment may not be substituted for construction, and . . . a court may not exercise legislative functions to save the law from conflict with constitutional limitation." *Yu Cong Eng* v. *Trinidad*, 271 U. S. 500, 518 (1926). Justice Brandeis, whose concurring opinion in *Ashwander* v. *TVA*, 297 U. S. 288, 341–356 (1936), is frequently cited as the definitive statement of the rule of "constitutional avoidance," himself cautioned: "The court may not, in order to avoid holding a statute unconstitutional, engraft upon it an exception or other provision. . . . Neither may it do so to avoid having to resolve a constitutional doubt." *Crowell* v. *Benson, supra,* at 76–77 (dissenting opinion). Adoption of a particular construction to avoid a constitutional ruling, Justice Brandeis stated, was appropriate only "where a statute is equally susceptible of two constructions, under one of which it is clearly valid and under the other of which it may be unconstitutional." 285 U. S., at 76.

These limits on our power to avoid constitutional issues through statutory construction flow from the same principle as does the policy of constitutional avoidance itself: that is,

the principle of deference to the legislature's exercise of its assigned role in our constitutional system. See *Rescue Army* v. *Municipal Court*, 331 U. S. 549, 571 (1947). The task of defining the objectives of public policy and weighing the relative merits of alternative means of reaching those objectives belongs to the legislature. The courts should not lightly take it upon themselves to state that the path chosen by Congress is an impermissible one; but neither are the courts free to redraft statutory schemes in ways not anticipated by Congress solely to avoid constitutional difficulties. The latter course may at times be a more drastic imposition on legislative authority than the former. When the choice facing a court is between finding a particular application of a statute unconstitutional and adopting a construction of the statute that avoids the difficulty but at the same time materially deviates from the legislative plan and frustrates permissible applications, the choice of constitutional adjudication may well be preferable.

With these guidelines in mind, I turn to consideration of the proper construction of the statute at hand.

## B

The Investment Advisers Act of 1940, 54 Stat. 847, as amended, 15 U. S. C. § 80b–1 *et seq.*, provides that persons doing business as "investment advisers" must (with certain exceptions) register with the SEC. § 80b–3(a). The Act sets forth substantive grounds for the denial or revocation of an investment adviser's registration. § 80b–3(e). It is unlawful for an adviser who has not registered or whose registration has been revoked, suspended, or denied to practice his trade; if he does so, he may be subject to criminal penalties, § 80b–17, or to injunction, § 80b–9(e). In addition to penalizing those who would offer investment advice without registering, the Act contains provisions applicable to all investment advisers, whether registered or not. Most notable among these are prohibitions on certain contracts between

advisers and their clients, see § 80b–5, recordkeeping requirements, see § 80b–4, and provisions that make it unlawful for advisers to engage in "fraudulent, deceptive, or manipulative" conduct, see § 80b–6.

There is no question but that if petitioner's publishing activities bring him within the statutory definition of an "investment adviser," the Act subjects him to injunction (and, presumably, criminal penalties) if he persists in engaging in those activities. Thus, if petitioner is an "investment adviser," the constitutional questions raised by the application of the Act's enforcement provisions to his conduct must be faced.

The starting point, then, must be the definition itself:

> "'Investment adviser' means any person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities, or who, for compensation and as part of a regular business, issues or promulgates analyses or reports concerning securities; but does not include . . . (D) the publisher of any bona fide newspaper, news magazine or business or financial publication of general and regular circulation." 15 U. S. C. § 80b–2(a)(11).

Although petitioner does not offer his subscribers investment advice specifically tailored to their individual needs and engages in no direct communications with them, he undeniably "engages in the business of advising others . . . through publications . . . as to the value of securities" and "issues or promulgates analyses or reports concerning securities." Thus, he falls outside the definition of an "investment adviser" only if each of his publications qualifies as a "bona fide newspaper, news magazine or business or financial publication of general and regular circulation." The question is whether the "bona fide publications" exception is to be con-

strued so broadly as to exclude from the definition all persons whose advisory activities are carried out solely through publications offering impersonal investment advice to their subscribers.

It is hardly crystal clear from the face of the statute how the primary definition and the "bona fide publications" exception are supposed to mesh, but the SEC has, since the Act's inception, interpreted the statutory definition of "investment adviser" to cover persons whose activities are limited to the publication of investment advisory newsletters or reports such as those published by petitioner. At the conclusion of the Act's first year of operation, the Commission reported that of the approximately 750 persons and firms registering under the Act, "165 firms indicated that their investment advisory service consisted only of the sale of uniform publications." Seventh Annual Report of the Securities and Exchange Commission, Fiscal Year Ended June 30, 1941, p. 35 (1942).[1] Since that time, it appears that the Commission has consistently and routinely applied the Act to the publishers of newsletters offering investment advice. See, *e. g.*, *SEC* v. *Capital Gains Research Bureau, Inc.*, 375 U. S. 180 (1963); *In re Todd*, 40 S. E. C. 303 (1960); see also Lovitch, The Investment Advisers Act of 1940—Who Is an "Investment Adviser"?, 24 Kan. L. Rev. 67 (1975).[2] The SEC's

---

[1] The Court argues that this fact is without significance, as it proves only that publishers found it to be to their own advantage to register. But the SEC's matter-of-fact announcement of the number of publishers registering under the Act establishes something else: from the beginning, the SEC assumed the Act applied to such publishers.

[2] In 1963, the Commission explained its view of the coverage of the Act as follows:

"The investment advisers who are required to register with the Commission under the Investment Advisers Act are certain firms (or individuals) engaged in the business of advising others for a fee on the value of the securities or the desirability of buying or selling securities. For the most part they fall into one of two groups: Those publishing advisory services and periodic market reports for subscribers; and those offering supervision

longstanding position that publishers of newsletters offering investment advice are investment advisers for purposes of the Act reflects a construction of the "bona fide publications" exception as "applicable only where, based on the content, advertising material, readership, and other relevant factors, a publication is not primarily a vehicle for distributing investment advice." Applicability of Investment Advisers Act to Certain Publications, SEC Release No. IA–563, 42 Fed. Reg. 2953 (1977), codified at 17 CFR § 276 (1984); cf. *SEC* v. *Suter*, 732 F. 2d 1294 (CA7 1984); *SEC* v. *Wall Street Transcript Corp.*, 422 F. 2d 1371 (CA2), cert. denied, 398 U. S. 958 (1970).

An agency's construction of legislation that it is charged with enforcing is entitled to substantial weight, particularly when the construction is contemporaneous with the enactment of the statute. See *Skidmore* v. *Swift & Co.*, 323 U. S. 134, 140 (1944). In cases where the policy of constitutional avoidance must be considered, however, the administrative construction cannot be decisive. See *United States* v. *Clark*, 445 U. S. 23, 33, n. 10 (1980). We must, therefore, turn to other guides to the meaning of the statute to determine whether a reasonable construction of the statute is available by which petitioner can be excluded from the category of investment advisers and the constitutional issues thereby be avoided.

Any construction that expands the "bona fide publications" exception beyond the bounds set by the SEC, however, poses great difficulties. If the exception is expanded to include more than just publications that are not primarily vehicles for distributing investment advice, it is difficult to imagine any workable definition that does not sweep in all publications that are not personally tailored to individual clients. Indeed, it appears that this is precisely the definition the Court

---

of individual clients' portfolios." Report of Special Study of Securities Markets of the Securities and Exchange Commission, H. R. Doc. No. 95, 88th Cong., 1st Sess., pt. 1, p. 146 (1963).

adopts.[3] But such an expansive definition of the exception renders superfluous certain key passages in the primary definition of an "investment adviser": one who engages in the business of rendering investment advice *"either directly or*

---

[3] The Court suggests that "tipsters" and "touts" might not qualify under its reading of the "bona fide publications" exception either because their publications are not sufficiently regular or because their advice is not sufficiently disinterested. Both suggestions seem implausible. As is evident from the Court's conclusion that petitioner's publications meet the regularity requirement, the Court's construction of the requirement adopts the view of our major law reviews on the issue of regular publication: good intentions are enough. Thus, if a "tout" or "tipster" promised to publish his recommendations at more or less regular intervals, he, like petitioner, would meet the regularity requirement. Moreover, a truly "hit and run" practitioner—one who did not even claim an intention of issuing further recommendations—would not fall within the definition of an "investment adviser" because he would not be deemed to "engag[e] in the business" of advising others. See Applicability of Investment Advisers Act to Certain Publications, SEC Release No. 1A–563, 42 Fed. Reg. 2953 (1977), codified at 17 CFR § 276 (1984). As for the Court's suggestion that "touts" and "tipsters" might not qualify under the exception if their advice was not disinterested, it appears completely unfounded: nowhere in the language or history of the Act is there any suggestion that whether a person is an investment adviser depends on whether his advice is disinterested. In addition, in suggesting that the character of the adviser's advice determines whether he falls within the "bona fide publications" exception, the Court contradicts itself. At one point, it states that the exception is based on "objective" criteria, and it purports to eschew a content-based interpretation of the term "bona fide." See *ante*, at, 207–208, n. 53. At another, the Court suggests that publications that offer advice that is not disinterested are not "bona fide." See *ante*, at 207–209, and n. 55. It is hard to understand why the Court prefers *its* content-based reading to the SEC's, particularly given that the SEC's reading is much simpler to apply in practice: if a publication is primarily a device for offering investment advice, it is not a "bona fide" newspaper, news magazine, or business or financial publication. Under the Court's reading, the SEC would have to force the publisher to disclose his own financial holdings and then compare his recommendations with his stock holdings in order to determine whether his publications were "bona fide." This requirement would be self-defeating, since the SEC has no authority under the Act to order such disclosures by anyone whom it does not already know to be an investment adviser.

*through publications or writings"* or who *"issues or pro-mulgates analyses or reports concerning securities."* Had Congress intended the "bona fide publications" exception to encompass *all* publications, it is difficult to imagine why the primary definition of "investment adviser" should have spoken in the disjunctive of those who rendered advice directly and those who rendered it through publications, analyses, or reports. Nor is it clear why Congress would have chosen the adjective "bona fide" had it not intended that the SEC look beyond the form of a publication in determining whether it fell within the exception.[4] The construction of the Act

---

[4] The Second Circuit's explication of the use of the term "bona fide" in the statute is instructive:

"Section 202(a)(11) of the Act lists a number of examples of persons or entities whose activities might fall within the broad definition of 'investment adviser' but whose customary practices would not place them in the special, otherwise unregulated, fiduciary role for which the law established standards. . . . The phrase 'bona fide' newspapers, in the context of this list, means those publications which do not deviate from customary newspaper activities to such an extent that there is a likelihood that the wrongdoing which the Act was designed to prevent has occurred. The determination of whether or not a given publication fits within this exclusion must depend upon the nature of its practices rather than upon the purely formal 'indicia of a newspaper' which it exhibits on its face and in the size and nature of its subscription list." *SEC* v. *Wall Street Transcript Corp.*, 422 F. 2d 1371, 1377, cert. denied, 398 U. S. 958 (1970).

The Second Circuit's reasoning provides firm support for the SEC's position that the point of the "bona fide publications" exception is to differentiate publications devoted solely or primarily to the provision of investment advice from publications that contain more diversified or general discussions of news events and business or financial topics. The aim of the Act is the protection of the investing public against fraud or manipulation on the part of advisers. Viewed in light of this purpose, a publication that is no more than a vehicle for investment advice is an obvious target for regulatory measures: it makes sense to treat the entire publication as an adviser and to impose liability on the publication itself in the case of fraud or manipulation. On the other hand, the publisher of a publication that presents diverse forms of information and is not narrowly focused on the provision of investment advice is not so likely to engage in abusive prac-

that would exclude petitioner from the category of investment advisers because he offers his advice through publications thus conflicts with the fundamental axiom of statutory interpretation that a statute is to be construed so as to give effect to all its language. *Connecticut Dept. of Income Maintenance* v. *Heckler*, 471 U. S. 524, 530, and n. 15 (1985); *Reiter* v. *Sonotone Corp.*, 442 U. S. 330, 339 (1979).

Nothing in the legislative history of the statute supports a construction of "investment adviser" that would exclude persons who offer investment advice only through such publications as newsletters and reports. Although there is very little discussion of the issue, it is significant that in the hearings on the proposed legislation, representatives of both the SEC and the investment advisers expressed their view that the Act would cover the publishers of investment newsletters. David Schenker, the Chief Counsel of the SEC Investment Trust Study and one of the primary architects of the proposed legislation, explained that the term "investment advisers" as used in the Act "encompasses that broad category ranging from people who are engaged in the profession of furnishing disinterested, impartial advice to a certain economic stratum of our population to the other extreme, individuals engaged in running tipster organizations, or sending through the mails stock market letters." Hearings on S. 3580 before a Subcommittee of the Senate Committee on Banking and Currency, 76th Cong., 3d Sess., 47 (1940) (hereafter Senate Hearings). In the later House hearings, James White, a representative of a Boston investment counsel firm

---

tices. Thus, it is logical to treat the publication itself as a "bona fide publication" and to exempt its publisher from classification as an investment adviser. Individual writers who make it their business to offer investment advice to the publication's readers on a regular basis, however, may still be covered. See Lovitch, The Investment Advisers Act of 1940—Who Is an "Investment Adviser"?, 24 Kan. L. Rev. 67, 94, n. 222 (1975) (noting SEC staff's position that columnists who offer investment advice in exempt publications are investment advisers).

who was among the industry spokesmen who cooperated with the SEC in the later stages of the drafting of the bill, expressed the same view of the scope of the statutory definition in its final form: "the term includes people who send out bulletins from time to time on the advisability of buying or selling stocks, or even giving tips on cheap stocks, and goes all of the way from that to individuals and firms who undertake to give constant supervision to the entire investments of their clients on a personal basis and who even advise them on tax matters and other financial matters which essentially are not a question of choice of investments."[5] Hearings on H. R. 10065 before a Subcommittee of the House Committee on Interstate and Foreign Commerce, 76th Cong., 3d Sess., 87 (1940). Later in his testimony, White specifically explained to Representative Boren that persons whose advice was furnished solely through publications were *not* excepted from the class of investment advisers as defined in the Act.

---

[5] The Court correctly points out that Mr. Schenker's statement was made before the "bona fide publications" exception was in its final form and before the inclusion in the record of the Subcommittee hearings of the Illinois report that suggested that regulation of publishers might raise First Amendment problems. The Court neglects to acknowledge that Mr. White's statement postdated both the submission of the report to the Senate Subcommittee and the amendment of the Act's definition to its final form. White's statement is a plain indication that the drafters of the bill had not changed their position since the inception of the Senate hearings: publishers were still viewed to be within the Act.

The Court also suggests that its interpretation of the scope of the exception is consistent with White's statement that persons who "send out bulletins from time to time" offering investment advice are investment advisers. Such persons, the Court suggests, would not meet the "regularity" requirement of the "bona fide publications" exception. But the Court's own loose construction of the requirement belies this argument: petitioner himself, at best, can be described as a person who sends out bulletins "from time to time." If the timeliness of petitioner's publications is sufficient to meet the Act's regularity requirement, it is hard to imagine a publisher who could not qualify.

See *id.*, at 90–91.[6] And although the House and Senate Reports are in the main silent on the question of the extent to which advisers operating solely through publications are governed by the Act, the Senate Report does at least make clear that a personal relationship between adviser and client is not a *sine qua non* of an investment adviser under the statute: the Report states that the Act "recognizes that with respect to *a certain class of* investment advisers, a type of personalized relationship *may* exist with their clients." S. Rep. No. 1775, 76th Cong., 3d Sess., 22 (1940) (emphasis added).[7]

---

[6] The Court argues that my interpretation of the exchange between Boren and White is incorrect. I am at a loss to understand this contention. To my mind, the colloquy, as reprinted by the Court, unambiguously supports my reading. Representative Boren asked Mr. White why persons who dispensed investment advice through publications should be excluded from the category of investment advisers. White answered the question by pointing out that its premise was incorrect: Boren was reading the wrong definition. The clear implication was that the correct definition did include such publishers, and Boren's last remark—"that clarifies it for me"—indicates that he took the point.

[7] In reaching the opposite conclusion, the Court relies on a hodgepodge of materials that are either completely irrelevant or reflect approaches that were explicitly rejected by the framers of the statute. For example, the Court correctly notes that the SEC Report that was in large measure the impetus for the Investment Advisers Act restricted its attention to "investment counsel"—that is, investment advisers maintaining a personal relationship with individual clients. See Investment Trusts and Investment Companies, Report of the Securities and Exchange Commission, Pursuant to Section 30 of the Public Utility Holding Company Act of 1935, Investment Counsel, Investment Management, Investment Supervisory, and Investment Advisory Services, H. R. Doc. No. 477, 76th Cong., 2d Sess. (1939). But imputing the narrow focus of the Report to the Act itself would be a serious mistake, for the Act explicitly covers investment advisers who cannot be described as "investment counsel." This is evident from § 208(c) of the Act, which provides that no investment adviser may hold himself out as "investment counsel" unless "a substantial part of his . . . business consists of rendering investment supervisory services"—"investment supervisory services" being defined by § 202(a)(13) of the Act as "the giving of continuous advice as to the investment of funds

The subsequent legislative history of the Act testifies to Congress' continuing belief that the legislation it has enacted applies to publishers of investment advice as well as to per-

---

on the basis of the individual needs of each client." The Act could not be clearer: not all "investment advisers" under the Act are "investment counsel." The Act's careful distinction between "investment counsel" and the other investment advisers subject to its provisions leaves no doubt that the framers of the Act intended it to cover advisers *not* engaged in personal investment counseling as well as "investment counsel." For this reason, it can by no means be said that the SEC Report's focus on "investment counsel" limits the scope of the Act.

The Court's reliance on the self-serving statements of industry representatives regarding the importance of their personal relationships with their clients is similarly misplaced. First, it is abundantly clear that the investment counsel who testified before the Senate Subcommittee were *not* suggesting that only advisers with personal relationships with their clients should be covered by the Act—far from it. Rather, the import of their statements was that reputable "investment counsel" who had a personal fiduciary relationship with their clients did not require federal regulation (unlike the "touts and tipsters" whom these investment counselors unanimously reviled).

Second, it appears that the primary problem these "investment counsel" had with the Act was their fear that it would require them to disclose confidential communications with their clients. This concern was dealt with through the insertion into the Act of § 210(c), which provides that "[n]o provision of this subchapter shall be construed to require, or to authorize the Commission to require any investment adviser engaged in rendering investment supervisory services to disclose the identity, investments, or affairs of any client of such investment adviser, except insofar as such disclosure may be necessary or appropriate in a particular proceeding or investigation having as its object the enforcement of a provision or provisions of this subchapter." 15 U. S. C. § 80b–10(c). The references in the House and Senate Reports to the "care [that] has been taken . . . to respect this relationship between investment advisers and their clients," see *ante*, at 201, obviously refer to this provision for confidentiality and to the provision restricting the class of investment advisers who may claim the title "investment counsel." The Reports' references to adviser-client relationships thus by no means suggest that the Act limited its definition of "investment advisers" to those who offered personalized services. Indeed, § 210(c) of the Act, in referring to "investment advisers engaged in rendering investment supervisory services"—that is, "the giving of con-

sons who offer personal investment counseling. In 1960, Congress substantially expanded the penalties available to the Commission for use against unregistered advisers and advisers engaged in fraudulent or manipulative activities. Pub. L. 86–750, 74 Stat. 885. In describing the scope of the legislation, the Senate Report explained that "[t]hose defined as investment advisers by the act range from investment counsel firms, brokers whose advice is not incidental to their business, *financial publishing houses not of general circulation, tout sheets* and others." S. Rep. No. 1760, 86th Cong., 2d Sess., 2 (1960) (emphasis added). In 1970, Con-

---

tinuous advice as to the investment of funds on the basis of the individual needs of each client"—makes quite clear that some persons defined as "investment advisers" under the Act do *not* offer such personalized services.

The Court also errs in relying on the Illinois report reprinted in the Senate Hearings as authority for the notion that Congress intended to exclude all publishers from the definition of "investment adviser" in order to avoid constitutional difficulties. See *ante,* at 197–199. This report cannot bear the weight the Court places on it. The discussion in the report—buried in a document placed into the record after weeks of hearings—contains the only mention in the legislative history of the Act of the potential First Amendment difficulties raised by including publications within the category of investment advisers. Still more significant is the definite rejection of the report's recommended solution to the First Amendment problem by the drafters of the Act. The report's recommendation was that any legislation regulating "investment counselors" should "carefully defin[e] the term 'investment counselor' so as to exclude 'any person or organization which engages in the business of furnishing investment analysis, opinion, or advice solely through publications distributed to a list of subscribers and not furnishing specific advice to any client with respect to securities, and also persons or organizations furnishing only economic advice and not advice relating to the purchase or sale of securities.'" Senate Hearings, at 1009. This approach, the report noted, was "generally the same as that used by the [SEC] in limiting the scope of its report on investment counsel organizations." *Ibid.* The Act, of course, did *not* carefully exclude persons who furnished advice through publications—it expressly *included* them in its definition. Moreover, the Act's provisions make it quite clear that the definition of "investment adviser" in § 202(a)(11) is more expansive than the definition of "investment counsel" used in the SEC study and in § 208(c) of the Act itself.

gress again expanded the enforcement authority of the SEC, see Pub. L. 91–547, 84 Stat. 1430; and again, the Senate Report explained that the Act "regulates the activities of those who receive compensation for advising others with respect to investments in securities *or who are in the business of issuing analyses or reports concerning securities.*" S. Rep. No. 91–184, p. 43 (1969) (emphasis added).

A construction of the Act that excludes publishers of investment advisory newsletters from the definition of "investment adviser" not only runs counter to the statute's language, legislative history, and administrative construction, but also frustrates the policy of the Act by preventing apparently legitimate applications of the statute. The SEC has long been concerned with the problem of fraudulent and manipulative practices by some investment advisory publishers—specifically, with the problem of "scalping," whereby a person associated with an advisory service "purchas[es] shares of a security for his own account shortly before recommending that security for long-term investment and then immediately sell[s] the shares at a profit upon the rise in the market price following the recommendation." *SEC* v. *Capital Gains Research Bureau, Inc.*, 375 U. S. 180, 181 (1963). An SEC study issued in 1963 emphasized that this practice is most dangerous when engaged in by an "advisory service with a sizable circulation"—that is, a newsletter or other publication—whose recommendation "could have at least a short-term effect on a stock's market price." Report of Special Study of Securities Markets of the Securities and Exchange Commission, H. R. Doc. No. 95, 88th Cong., 1st Sess., pt. 1, p. 372 (1963). The SEC study concluded that scalping was a serious problem within the investment advisory industry. See *id.*, at 371–373.

In *SEC* v. *Capital Gains Research Bureau, Inc., supra*, we held that the antifraud provisions of the Investment Advisers Act could be invoked against the publisher of an investment advisory newsletter who had engaged in scalping, and that such

an adviser could be required "to make full and frank disclosure of his practice of trading on the effect of his recommendations." *Id.*, at 197. The Court's construction of the Act, under which a publisher like petitioner is not an "investment adviser" and is therefore not subject to the Act's antifraud provisions, effectively overrules *Capital Gains* and limits the SEC's power to protect the public against a potentially serious form of fraud and manipulation. But there is no suggestion that the application of the antifraud provisions of the Act to require investment advisory publishers to disclose material facts would present serious First Amendment difficulties. See *Zauderer* v. *Office of Disciplinary Counsel*, 471 U. S. 626, 651 (1985); *Village of Schaumburg* v. *Citizens for a Better Environment*, 444 U. S. 620, 637–638 (1980); *Schneider* v. *State*, 308 U. S. 147, 164 (1939).[8] Accordingly, the Court's zeal to avoid the narrow constitutional issue presented by the case leads it to adopt a construction of the Act that, wholly unnecessarily, prevents what would seem to be desirable and constitutional applications of the Act—a result at odds with our longstanding policy of construing securities regulation enactments broadly and their exemptions narrowly in order to effectuate their remedial purposes. See, *e. g.*, *Tcherepnin* v. *Knight*, 389 U. S. 332, 336 (1967).[9]

---

[8] Similarly, the application of the Act's reporting requirements, 15 U. S. C. § 80b–4, to investment advisers whose activities are restricted to publishing would not appear to raise serious First Amendment concerns. The reporting requirements would not inhibit such advisers from speaking, and it is well settled that "[t]he Amendment does not forbid . . . regulation which ends in no restraint upon expression or in any other evil outlawed by its terms and purposes." *Oklahoma Press Publishing Co.* v. *Walling*, 327 U. S. 186, 193 (1946). See also *Branzburg* v. *Hayes*, 408 U. S. 665 (1972), in which we held that the press is not exempt from the generally applicable requirement that a citizen produce evidence in response to a subpoena.

[9] The Court brushes aside the significance of this consequence by suggesting that alternative remedies—specifically, remedies under Rule 10b–5—may be available. This may be so, although the requirement of Rule

226

It is ironic that this construction, at odds with the language, history, and policies of the Act, is adopted in the name of constitutional avoidance. One does not have to read the Court's opinion very closely to realize that its interpretation of the Act is in fact based on a thinly disguised conviction that the Act is unconstitutional as applied to prohibit publication of newsletters by unregistered advisers. Indeed, the Court tips its hand when it discusses the Court's decisions in *Lovell* v. *City of Griffin*, 303 U. S. 444 (1938), and *Near* v. *Minnesota ex rel. Olson*, 283 U. S. 697 (1931). The Court reasons that given these decisions, which forbade certain forms of prior restraints on speech, the 76th Congress could not have intended to enact a licensing provision for investment advisers that would include persons whose advisory activities were limited to publishing. The implication is that the application of the Act's penalties to unregistered publishers would violate the principles of *Lovell* and *Near;* and because Con-

---

10b–5 that any nondisclosure violate an existing fiduciary duty, see *Chiarella* v. *United States*, 445 U. S. 222 (1980), leaves the matter in some doubt. The District Court in *SEC* v. *Blavin*, 557 F. Supp. 1304 (ED Mich. SD 1983), aff'd, 760 F. 2d 706 (CA6 1985), had little difficulty in finding a fiduciary duty, for it held that the defendant's publishing activities brought him squarely within the Act's definition of an "investment adviser," and that "as [an investment adviser, he] had a duty to his clients and readers to undertake some reasonable investigation of the figures he was printing before he printed them." 557 F. Supp., at 1314. The Court, of course, holds that publishers like petitioner (and Blavin) are not investment advisers and thus excludes the possibility that the Investment Advisers Act could supply the requisite fiduciary duty. The Court also hypothesizes that scalping by a publisher might constitute mail fraud, but again, as far as I am aware, that is no more than an open question. The certainty that the Investment Advisers Act provides a remedy against scalping thus remains, for me, a persuasive reason for not adopting a construction of the Act that would exclude petitioner. In addition, the antifraud provisions of the Act are supplemented by reporting requirements that may be used to aid the SEC in uncovering scalping. By taking petitioner outside the category of investment advisers, the Court places him beyond the reach of these additional tools for uncovering deceit.

gress is assumed to know the law, see *ante,* at 205, n. 50, the Court concludes that it must not have intended that result.

This reasoning begs the question. What we have been called on to decide in this case is precisely whether restraints on petitioner's publication *are* unconstitutional in light of such decisions as *Near* and *Lovell.* While purporting not to decide the question, the Court bases its statutory holding in large measure on the assumption that Congress already knew the answer to it when the statute was enacted. The Court thus attributes to the 76th Congress a clairvoyance the Solicitor General and the Second Circuit apparently lack—that is, the ability to predict our constitutional holdings 45 years in advance of our declining to reach them. If the policy of constitutional avoidance amounts to no more than a preference for implicitly deciding constitutional questions without explaining our reasoning, and if the consequence of adopting the policy is a statutory decision more disruptive of the legislative framework than a decision on the narrow constitutional issue presented, the purposes underlying the policy have been ill-served. In light of the language, history, and purposes of the statute, I would read its definition of "investment adviser" to encompass publishers like petitioner, and turn to the constitutional question. In the words of Justice Cardozo:

> "[A]voidance of a difficulty will not be pressed to the point of disingenuous evasion. Here the intention of the Congress is revealed too distinctly to permit us to ignore it because of mere misgivings as to power. The problem must be faced and answered." *George Moore Ice Cream Co.* v. *Rose,* 289 U. S. 373, 379 (1933).

## II

Petitioner, an investment adviser whose registration has been revoked, seeks to continue the practice of his profession by publishing newsletters containing investment advice.

The SEC, consistent with the terms of the Act as I read them, has attempted to enjoin petitioner from engaging in these activities. The question is whether the First Amendment permits the Federal Government so to prohibit petitioner's publication of investment advice.

## A

This issue involves a collision between the power of government to license and regulate those who would pursue a profession or vocation and the rights of freedom of speech and of the press guaranteed by the First Amendment. The Court determined long ago that although "[i]t is undoubtedly the right of every citizen of the United States to follow any lawful calling, business, or profession he may choose, . . . there is no arbitrary deprivation of such right where its exercise is not permitted because of a failure to comply with conditions imposed . . . for the protection of society." *Dent* v. *West Virginia*, 129 U. S. 114, 121–122 (1889). Regulations on entry into a profession, as a general matter, are constitutional if they "have a rational connection with the applicant's fitness or capacity to practice" the profession. *Schware* v. *Board of Bar Examiners*, 353 U. S. 232, 239 (1957).

The power of government to regulate the professions is not lost whenever the practice of a profession entails speech. The underlying principle was expressed by the Court in *Giboney* v. *Empire Storage & Ice Co.*, 336 U. S. 490, 502 (1949): "it has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed."

Perhaps the most obvious example of a "speaking profession" that is subject to governmental licensing is the legal profession. Although a lawyer's work is almost entirely devoted to the sort of communicative acts that, viewed in isolation, fall within the First Amendment's protection, we

have never doubted that "[a] State can require high standards of qualification, such as good moral character or proficiency in its law, before it admits an applicant to the bar . . . ." *Schware* v. *Board of Bar Examiners, supra,* at 239. The rationale for such limits was expressed by Justice Frankfurter:

> "One does not have to inhale the self-adulatory bombast of after-dinner speeches to affirm that all the interests of man that are comprised under the constitutional guarantees given to 'life, liberty and property' are in the professional keeping of lawyers. It is a fair characterization of the lawyer's responsibility in our society that he stands 'as a shield,' to quote Devlin, J., in defense of right and to ward off wrong. From a profession charged with such responsibilities there must be exacted those qualities of truth-speaking, of a high sense of honor, of granite discretion, of the strictest observance of fiduciary responsibility, that have, throughout the centuries, been compendiously described as 'moral character.'" 353 U. S., at 247 (concurring opinion).

The Government's position is that these same principles support the legitimacy of its regulation of the investment advisory profession, whether conducted through publications or through personal client-adviser relationships. Clients trust in investment advisers, if not for the protection of life and liberty, at least for the safekeeping and accumulation of property. Bad investment advice may be a cover for stock-market manipulations designed to bilk the client for the benefit of the adviser; worse, it may lead to ruinous losses for the client. To protect investors, the Government insists, it may require that investment advisers, like lawyers, evince the qualities of truth-speaking, honor, discretion, and fiduciary responsibility.

But the principle that the government may restrict entry into professions and vocations through licensing schemes has never been extended to encompass the licensing of speech

*per se* or of the press. See *Thomas* v. *Collins*, 323 U. S. 516 (1945); *Lovell* v. *City of Griffin*, 303 U. S. 444 (1938); *Schneider* v. *State*, 308 U. S. 147 (1939); *Near* v. *Minnesota ex rel. Olson*, 283 U. S. 697 (1931); *Cantwell* v. *Connecticut*, 310 U. S. 296 (1940); *Village of Schaumburg* v. *Citizens for a Better Environment*, 444 U. S. 620 (1980); *Jamison* v. *Texas*, 318 U. S. 413 (1943). At some point, a measure is no longer a regulation of a profession but a regulation of speech or of the press; beyond that point, the statute must survive the level of scrutiny demanded by the First Amendment.

The Government submits that the location of the point at which professional regulation (with incidental effects on otherwise protected expression) becomes regulation of speech or the press is a matter that should be left to the legislature. In this case, the Government argues, Congress has determined that investment advisers—including publishers such as petitioner—are fiduciaries for their clients. Accordingly, Congress has the power to limit entry into the profession in order to ensure that only those who are suitable to fulfill their fiduciary responsibilities may engage in the profession.

I cannot accept this as a sufficient answer to petitioner's constitutional objection. The question whether any given legislation restrains speech or is merely a permissible regulation of a profession is one that we ourselves must answer if we are to perform our proper function of reviewing legislation to ensure its conformity with the Constitution. "It is emphatically the province and duty of the judicial department to say what the law is." *Marbury* v. *Madison*, 1 Cranch 137, 177 (1803). Although congressional enactments come to this Court with a presumption in favor of their validity, see *Rostker* v. *Goldberg*, 453 U. S. 57, 64 (1981), Congress' characterization of its legislation cannot be decisive of the question of its constitutionality where individual rights are at issue. See *Trop* v. *Dulles*, 356 U. S. 86, 94–104 (1958) (plurality opinion of Warren, C. J.); cf. *Buckley* v. *Valeo*,

424 U. S. 1, 14–24 (1976) *(per curiam)*. Surely it cannot be said, for example, that if Congress were to declare editorial writers fiduciaries for their readers and establish a licensing scheme under which "unqualified" writers were forbidden to publish, this Court would be powerless to hold that the legislation violated the First Amendment. It is for us, then, to find some principle by which to answer the question whether the Investment Advisers Act as applied to petitioner operates as a regulation of speech or of professional conduct.

This is a problem Justice Jackson wrestled with in his concurring opinion in *Thomas* v. *Collins,* 323 U. S., at 544–548. His words are instructive:

> "[A] rough distinction always exists, I think, which is more shortly illustrated than explained. A state may forbid one without its license to practice law as a vocation, but I think it could not stop an unlicensed person from making a speech about the rights of man or the rights of labor, or any other kind of right, including recommending that his hearers organize to support his views. Likewise, the state may prohibit the pursuit of medicine as an occupation without its license, but I do not think it could make it a crime publicly or privately to speak urging persons to follow or reject any school of medical thought. So the state to an extent not necessary now to determine may regulate one who makes a business or a livelihood of soliciting funds or memberships for unions. But I do not think it can prohibit one, even if he is a salaried labor leader, from making an address to a public meeting of workmen, telling them their rights as he sees them and urging them to unite in general or to join a specific union." *Id.,* at 544–545.

Justice Jackson concluded that the distinguishing factor was whether the speech in any particular case was "associat[ed] . . . with some other factor which the state may regulate so as to bring the whole within official control." *Id.,* at 547.

If "in a particular case the association or characterization is a proven and valid one," he concluded, the regulation may stand. *Ibid.*

These ideas help to locate the point where regulation of a profession leaves off and prohibitions on speech begin. One who takes the affairs of a client personally in hand and purports to exercise judgment on behalf of the client in the light of the client's individual needs and circumstances is properly viewed as engaging in the practice of a profession. Just as offer and acceptance are communications incidental to the regulable transaction called a contract, the professional's speech is incidental to the conduct of the profession. If the government enacts generally applicable licensing provisions limiting the class of persons who may practice the profession, it cannot be said to have enacted a limitation on freedom of speech or the press subject to First Amendment scrutiny.[10] Where the personal nexus between professional and client does not exist, and a speaker does not purport to be exercising judgment on behalf of any particular individual with whose circumstances he is directly acquainted, government regulation ceases to function as legitimate regulation of professional practice with only incidental impact on speech; it becomes regulation of speaking or publishing as such, subject to the First Amendment's command that "Congress shall make no law . . . abridging the freedom of speech, or of the press." [11]

---

[10] Of course, it is possible that conditions the government might impose on entry into a profession would in some cases themselves violate the First Amendment. For example, denial of a license on the basis of the applicant's beliefs or political statements he had made in the past could constitute a First Amendment violation. However, in such a case, the problem would not be that it was impermissible for the government to restrict entry into the profession because of the nature of the profession itself.

[11] See *Near* v. *Minnesota ex rel. Olson,* 283 U. S. 697, 720 (1931) ("Characterizing the publication as a business, and the business as a nuisance, does not permit an invasion of the constitutional immunity against restraint").

As applied to limit entry into the profession of providing investment advice tailored to the individual needs of each client, then, the Investment Advisers Act is not subject to scrutiny as a regulation of speech—it can be justified as a legitimate exercise of the power to license those who would practice a profession, and it is no more subject to constitutional attack than state-imposed limits on those who may practice the professions of law and medicine. The application of the Act's enforcement provisions to prevent unregistered persons from engaging in the business of publishing investment advice for the benefit of any who would purchase their publications, however, is a direct restraint on freedom of speech and of the press subject to the searching scrutiny called for by the First Amendment.

B

The recognition that the prohibition on the publishing of investment advice by persons not registered under the Act is a restraint on speech does not end the inquiry. Not all restrictions on speech are impermissible. The Government contends that even if the statutory restraints on petitioner's publishing activities are deemed to be restraints on speech rather than mere regulations of entry into a profession, petitioner's speech is "expression related solely to the economic interests of the speaker and its audience," *Central Hudson Gas & Electric Corp.* v. *Public Service Comm'n of New York,* 447 U. S. 557, 561 (1980), and is therefore subject to the reduced protection afforded what we have come to describe as "commercial speech." See *Zauderer* v. *Office of Disciplinary Counsel,* 471 U. S. 626 (1985). Under the commercial speech doctrine, restrictions on commercial speech that directly advance a substantial governmental interest may be upheld. See *id.,* at 638. The prohibition on petitioner's publishing activities, the Government suggests, is such a permissible restriction, as it directly advances the goal of protecting the investing public against unscrupulous advisers.

Petitioner, echoing the dissent below, argues that the expression contained in his newsletters is not commercial speech, as it does not propose a commercial transaction between the speaker and his audience. See *Virginia Pharmacy Board* v. *Virginia Citizens Consumer Council, Inc.*, 425 U. S. 748, 762 (1976). Although petitioner concedes that his speech relates to economic subjects, he argues that it is not for that reason stripped of its status as fully protected speech. See *Thomas* v. *Collins*, 323 U. S., at 531. Accordingly, he argues, the prohibition on his speech can be upheld "only if the government can show that the regulation is a precisely drawn means of serving a compelling state interest." *Consolidated Edison Co.* v. *Public Service Comm'n of New York*, 447 U. S. 530, 541 (1980).

I do not believe it is necessary to the resolution of this case to determine whether petitioner's newsletters contain fully protected speech or commercial speech. The Act purports to make it unlawful for petitioner to publish newsletters containing investment advice and to authorize an injunction against such publication. The ban extends as well to legitimate, disinterested advice as to advice that is fraudulent, deceptive, or manipulative. Such a flat prohibition or prior restraint on speech is, as applied to fully protected speech, presumptively invalid and may be sustained only under the most extraordinary circumstances. See *New York Times Co.* v. *United States*, 403 U. S. 713 (1971); *Schneider* v. *State*, 308 U. S. 147 (1939); *Near* v. *Minnesota ex rel. Olson*, 283 U. S. 697 (1931). I do not understand the Government to argue that the circumstances that would justify a restraint on fully protected speech are remotely present in this case.

But even where mere "commercial speech" is concerned, the First Amendment permits restraints on speech only when they are narrowly tailored to advance a legitimate governmental interest. The interest here is certainly legitimate: the Government wants to prevent investors from falling into the hands of scoundrels and swindlers. The means

chosen, however, is extreme. Based on petitioner's past misconduct, the Government fears that he may in the future publish advice that is fraudulent or misleading; and it therefore seeks to prevent him from publishing *any* advice, regardless of whether it is actually objectionable. Our commercial speech cases have consistently rejected the proposition that such drastic prohibitions on speech may be justified by a mere possibility that the prohibited speech will be fraudulent. See *Zauderer, supra; In re R. M. J.*, 455 U. S. 191, 203 (1982); *Bates* v. *State Bar of Arizona*, 433 U. S. 350 (1977). So also here. It cannot be plausibly maintained that investment advice from a person whose background indicates that he is unreliable is *inherently* misleading or deceptive,[12] nor am I convinced that less drastic remedies than outright suppression (for example, application of the Act's antifraud provisions) are not available to achieve the Government's asserted purpose of protecting investors. Accordingly, I would hold that the Act, as applied to prevent petitioner from publishing investment advice altogether, is too blunt an instrument to survive even the reduced level of scrutiny called for by restrictions on commercial speech. The Court's observation in *Schneider* v. *State, supra,* at 164, is applicable here as well:

> "Frauds may be denounced as offenses and punished by law. . . . If it is said that these means are less efficient and convenient than bestowal of power on police authorities to decide what information may be disseminated . . . and who may impart the information, the answer is that considerations of this sort do not empower [government] to abridge freedom of speech and press."

---

[12] Cf. *Near* v. *Minnesota ex rel. Olson, supra,* in which the Court held that previous publication of defamatory material—unprotected speech—could not justify a prior restraint limited to further publication of defamatory matter. Here, the ban on petitioner's future publishing activities extends to nondeceptive (that is, protected) as well as fraudulent speech.

## III

I emphasize the narrowness of the constitutional basis on which I would decide this case. I see no infirmity in defining the term "investment adviser" to include a publisher like petitioner, and I would by no means foreclose the application of, for example, the Act's antifraud or reporting provisions to investment advisers (registered or unregistered) who offer their advice through publications. Nor do I intend to suggest that it is unconstitutional to invoke the Act's provisions for injunctive relief and criminal penalties against unregistered persons who, for compensation, offer personal investment advice to individual clients. I would hold only that the Act may not constitutionally be applied to prevent persons who are unregistered (including persons whose registration has been denied or revoked) from offering impersonal investment advice through publications such as the newsletters published by petitioner.

Although this constitutional holding, unlike the Court's statutory holding, would not foreclose the SEC from treating petitioner as an "investment adviser" for some purposes, it would require reversal of the judgment of the Court of Appeals. I therefore concur in the result.