**LONG ISLAND LIGHTING COMPANY, Plaintiff,**

v.

**Maurice BARBASH, Norman E. Blankman, Nora Bredes, Elaine Benson, Leon Campo, Bill Chaleff, Frazer Dougherty, Jack Hohenberger, Dan Gluck, Leonard Goldschmidt, Lou Grasso, Joseph Kaufman, Nancy Kelly, Irving Like, Sharon Luscombe, William Marran, William Massino, Edward McGovern, Arthur Metzger, Deborah Perry, Nathan Pitt, Clair Siegal, Alex Sneddon, Judith Sneddon, Robert Snyder, Tom Twomey, Dave Willmott, John W. Matthews, and Island Insulation Corp., Defendants.**

No. CV–85–3858.

United States District Court, E.D. New York.

Nov. 8, 1985.

Shea & Gould by Michael Lesch, New York City, for plaintiff.

Reilly, Like & Schneider by Irving Like, Babylon, N.Y., Baer, Marks & Upham by Eugene Scheiman and Thomas Albright, Skadden, Arps, Slate, Meagher & Flom by Patrick J. Foye, Jeremy Berman and Thomas J. Schwartz, New York City, for defendants.

## MEMORANDUM DISMISSING COMPLAINT

WEINSTEIN, Chief Judge:

Plaintiff, the Long Island Lighting Company, seeks to enjoin defendants from publishing a newspaper advertisement advocating public ownership of plaintiff's property. LILCO contends that the advertisement constitutes an improper proxy solicitation within the meaning of Securities and Exchange Commission regulations. The utility alleges that continued publication threatens to affect a proxy fight for control of the company in a way that will cause irreparable harm to its standing within the financial community.

As indicated below, the case must be dismissed. SEC regulations do not prevent such advertisements, nor could they without violating fundamental First Amendment rights of free speech.

## I. FACTS

Plaintiff LILCO, a New York corporation engaged in the generation, transmission and distribution of electrical power to some three million residents and many commercial, industrial and governmental establishments in three New York counties, seeks to enjoin the publication of an advertisement (Appendix A) sponsored by Citizens to Replace LILCO. The named defendants in this suit, with the exception of Matthews and Island Insulation Corp., are all members of Citizens' steering committee. Defendant Matthews was, until November 5, a candidate for Nassau County Executive; he is the president and sole shareholder of Island Insulation Corp. and the self-styled leader of a proxy fight being waged against LILCO's current management. Matthews personally holds 100 shares of LILCO preferred stock and controls the common shares held by Island Insulation. There is no dispute that these shares were properly used to initiate the proxy contest.

Citizens was created before this controversy began as one response to the growing dissatisfaction by some segments of the community with LILCO's construction of the Shoreham atomic energy plant, its service and its rates. Federal, state, and local government officials have participated in this energetic public debate. *See, e.g., Newsday,* Nov. 1, 1985, at 3, 27. Citizens is dedicated to converting LILCO into a publicly-owned utility. Through its advertisements Citizens has urged that conversion to public ownership be accomplished by securing legislation to abolish LILCO and to replace it with a Long Island Power Authority.

Converting LILCO to a publicly-owned utility was a central plank of Matthews' election platform. To help accomplish this conversion Matthews on about October 9,

1985 demanded that LILCO hold a special meeting for the purpose of electing a majority of LILCO's board of directors. On October 10 Island Insulation demanded that LILCO allow it to make copies and extracts of LILCO's stock ledgers and lists of stockholders. On October 20, 1985, pursuant to Matthews' demand, LILCO scheduled a special stockholders meeting for November 29, 1985. On October 21, 1985, Matthews, pursuant to SEC regulations, filed proxy materials with the SEC.

LILCO alleges that Matthews and Citizens conspired to influence the outcome of the proxy fight in favor of a management favoring public ownership of LILCO's property. There is no dispute that Matthews did have contacts with members of Citizens, including defendants Barbash and Like. The first occasion was a telephone call made about September 25, 1985 by Matthews to Like to arrange a meeting with Citizens members to discuss the group's objectives. On October 15 one of the advertisements appeared in *Newsday*. The next day, in a second conversation with Like, Matthews reiterated his interest in meeting with Citizens. The third and final occasion was an October 17, 1985 meeting attended by Barbash, Like, and Matthews and the latter's press spokesman and counsel.

Plaintiff contends that these meetings resulted in the publication of the Citizens-sponsored advertisement critical of LILCO's management and service record in several New York area newspapers. A redacted form of the printed advertisement was also aired on New York area radio stations. Defendants, in their affidavits, attest that Matthews was specifically told that a political endorsement would not be forthcoming and that his plans for LILCO were divergent from Citizens' strategy.

Although LILCO concedes that the advertisement does not purport to be a proxy solicitation, it nevertheless urges that it is, in effect, an illegal proxy solicitation. LILCO also alleges the advertisement contains several false and misleading statements that constitute a violation of SEC regulations governing proxy solicitation.

Pursuant to SEC regulations, LILCO seeks to enjoin further publication or broadcast of the advertisement until such time as the allegedly misleading statements are corrected.

## II. PROCEDURAL HISTORY

This action was initially brought to a judge's attention in the form of an appeal from a Magistrate's decision to deny plaintiff's motion for expedited discovery. Defendants then moved to dismiss for failure to state a claim.

In light of the impending election, and mindful of the serious First Amendment issues raised by the controversy, the motion was adjourned by the court to the morning after Election Day. Pursuant to Rule 12(b) of the Federal Rules of Civil Procedure, defendants' motion to dismiss for failure to state a claim was then treated as a Rule 56 motion for summary judgment.

Only attenuated discovery was permitted. Documents were supplied by defendants to plaintiff and brief questioning of Matthews by plaintiff under court supervision was permitted. Further discovery was not allowed since the court became convinced that no information likely to be revealed could support plaintiff's claims. Under these circumstances further delay in final disposition and increased costs to the parties was not warranted.

## III. LAW

A. Securities and Exchange Commission Regulations.

■ Section 14(a) of the Securities Exchange Act of 1934 makes it illegal to use any interstate mechanism to solicit a proxy in contravention of SEC regulations. It provides that:

> It shall be unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary

or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security.

15 U.S.C. § 78n(a).

Securities and Exchange Commission Regulation 14a controls direct and indirect solicitation, defining solicitation as:

   (i) Any request for a proxy whether or not accompanied by or included in a form of a proxy;

   (ii) Any request to execute or not to execute, or to revoke, a proxy; or

   (iii) The furnishing of a form of proxy or other communication to security holders under circumstances reasonably calculated to result in the procurement, withholding or revocation of a proxy.

17 C.F.R. § 240.14a–1(f)(1).

It is undisputed that the contested advertisement makes no mention of defendant Matthews, his campaign, or an impending proxy fight. The advertisement contains no language or reference to "proxies". Nevertheless, plaintiff urges a broad interpretation of section 14(a) to cover the Citizens advertisement.

To support this interpretation, plaintiff points to a communication sent to the general counsel of LILCO by the Securities and Exchange Commission severely limiting LILCO's right to speak. In salient portion, that telegram reads:

   [A]ny solicitation in the form of communications to shareholders, including speeches, press releases, interviews and planted or otherwise instigated press items designed to align opinion of shareholders to the cause of the person or group of persons issuing the material is subject to the provision of regulation 14a–9.

Regulation 14a–9 prohibits the use of false or misleading statements in proxy solicitation materials.

**B. The SEC Regulation Does Not Control The Advertisement.**

Plaintiff alleges the advertisement constitutes a solicitation within the meaning of the applicable SEC regulation.

Subparagraph (iii) on its face contemplates the control only of advertisements that are *"furnished to security holders* under circumstances *reasonably calculated"* to affect a shareholder's proxy decision. 17 C.F.R. § 240.14a–1(f)(1)(iii) (emphasis added). This Circuit has extended the meaning of solicitation to include "[any] other writings which are part of a continuous plan ending in solicitation and [which] prepare the way for its success." *SEC v. Okin,* 132 F.2d 784, 786 (2d Cir. 1943); *see Studebaker Corporation v. Gittlin,* 360 F.2d 692, 696 (2d Cir.1966). But these precedents do not authorize the type of censorship now proposed.

There is no precedent to support the notion that the solicitation rules are applicable to an advertisement purchased in connection with a serious public debate having important political implications. In both *Okin* and *Gittlin* the disputed "other writings" were communications mailed directly to shareholders by parties instigating the proxy fight. *See also Canadian Javelin Ltd. v. Brooks,* 462 F.Supp. 190 (S.D.N.Y. 1978) (defendants, members of a committee dedicated to the removal of current management, enjoined from mailing newspaper articles to plaintiff corporation's shareholders).

The rule that communications must be targeted directly at shareholders by parties intimately involved in the proxy fight is apparently recognized by the SEC itself. "[A]ny solicitation in the form of *communications to shareholders,* including ... press items *designed to align opinion of shareholders to* the cause of the person or group of *persons issuing the material"* is subject to regulation 14a. SEC Telegram to LILCO (Oct. 24, 1985) (emphasis added).

On its face, the contested advertisement seeks to align shareholders and ratepayers not with the cause of Matthews' proxy fight, but with the independent and un-

related group of persons who issued the advertisement in the name of Citizens. It is reasonable to assume that some of the readers of *Newsday*, or any of the other general circulation newspapers in which the Citizens advertisement appeared or will appear, may be LILCO shareholders. It is, however, entirely unreasonable to conclude that an advertisement addressing itself to the hundreds of thousands of LILCO ratepayers on Long Island who own no LILCO stock has been published primarily to furnish LILCO shareholders with clandestine proxy fight materials. [The reaction of Long Island residents to the advertisement is indicative of how it ought to be interpreted. Public response to the advertisement was substantial with Citizens attracting nearly 8,000 members after the advertisement ran. N.Y. Times, December 26, 1985, at B2, col. 1.] In sum, plaintiff has failed to establish any plausible causal link between the publication of the advertisement and the calculated effect on a shareholder's decision that the SEC regulations contemplate.

Having conceded what is apparent on the document's face—that the advertisement does not purport to be a proxy solicitation—plaintiff cannot now assert that the Citizens advertisement is a "request for a proxy ... [that is] not accompanied by or included in a form of proxy." 17 C.F.R. § 240.14a–1(f)(1)(i). Under the 14a regulation a proxy is defined to "include every proxy, consent or authorization within the meaning of section 14(a) of the act. The consent or authorization may take the form of failure to object or to dissent." 17 C.F.R. § 240.14a–1(d). The only requests made in the advertisement are for new members and contributions to a citizens group whose steering committee members are not LILCO shareholders and whose strategy for creating a publicly-owned electrical utility is directed towards Albany, not LILCO's boardroom.

Because the Citizens advertisement does not constitute a proxy solicitation within the meaning of the SEC regulation, plaintiff's allegations that it contains false and misleading statements are irrelevant. Any injunctive relief available under the statute for such violations can be obtained only upon an initial showing that the contested material is a proxy solicitation.

Proxies may, of course, be solicited directly or indirectly through advertisements in publications of general circulation. Under the special circumstances of this case, however, it is impossible to treat the advertisement in question as a solicitation subject to SEC control. Enjoining publication of the advertisement is improper first, because it does not, on its face, constitute a proxy solicitation; second, because in context it could not possibly be considered a proxy solicitation by any reasonable person; and finally, because to treat it as a proxy solicitation would seriously violate the First Amendment. It is to this last point that we now turn.

C.  First Amendment Considerations.

█ An advertisement of this kind is as fully protected by the First Amendment as any kind of writing. *New York Times v. Sullivan*, 376 U.S. 254, 256, 84 S.Ct. 710, 713, 11 L.Ed.2d 686 (1964).

The Citizens advertisement is primarily designed "to inform and motivate the public," *Brown v. Chicago, Rock Island & Pacific Railroad Co.*, 328 F.2d 122, 125 (7th Cir.1964), to participate in a public airing of views. The debate extends beyond the corporate financial world to encompass the health and economic well-being of the residents of a large community. This case therefore raises serious issues that reflect the competing values of First Amendment guarantees of free speech and the need to protect shareholders from unnecessarily destructive influences.

The concerns of the SEC and LILCO's management and shareholders that the conduct of publicly-held stock companies be properly regulated must be respected. The liberties of the public are, however, paramount. "In areas where legislation might intrude on constitutional guarantees, we believe that Congress, which has always sworn to protect the Constitution, would be on the side of fundamental constitutional

liberties when its legislation implicates those liberties." *Time, Inc. v. Regan,* 468 U.S. 641, 104 S.Ct. 3262, 3292, 82 L.Ed.2d 487 (1984) (Stevens, J. concurring in part and dissenting in part), quoted in *Lowe v. SEC,* —— U.S. ——, 105 S.Ct. 2557, 2571 n. 50, 86 L.Ed.2d 130 (1985).

The notion that the securities laws, like all legislative enactments, must be interpreted in a manner consistent with the First Amendment was explicitly affirmed by the Supreme Court in *Lowe v. SEC,* —— U.S. ——, 105 S.Ct. 2557, 86 L.Ed.2d 130 (1985). *Lowe* recognized that any attempt by government "to regulate the press through licensing of nonpersonalized publishing activities" would present grave First Amendment problems. *Id.,* 105 S.Ct. at 2570.

Critical to this case is the fact that an injunction would prevent dissemination of information to the general public. The arguments sought to be censored are being relied upon in an intense political and economic controversy. The outcome of that debate may affect the lives of millions of Long Island residents and tens of thousands of commercial and industrial establishments.

The difference between communications directed at corporate shareholders or potential investors and those aimed at the general public is that the former may be amenable to regulation while attempts to control the latter constitute an unconstitutional prior restraint on freedom to publish. This distinction is fundamental in our society and under our Constitution. *See, e.g., Patterson v. Colorado,* 205 U.S. 454, 456, 27 S.Ct. 556, 51 L.Ed. 879 (1907); *Nebraska Press Association v. Stuart,* 427 U.S. 539, 561, 96 S.Ct. 2791, 2803, 49 L.Ed.2d 683 (1976). It does not disappear merely because plaintiff in this case has chosen to characterize an advertisement as part of the process of proxy solicitation.

Essential to meaningful public debate is the First Amendment's presumption against statutes that paternalistically attempt to control speech for the "good" of the populace. *First National Bank of Boston v. Bellotti,* 435 U.S. 765, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978). Allowing injunctive relief on the ground that the advertisement constitutes an improper proxy solicitation would pervert the legitimate protective function of the regulation into an unconstitutional licensing of political speech.

In this case, as in *Lowe,* a saving construction of the SEC regulation is both possible and plausible. Even if defendants did conspire to influence the outcome of the proxy fight—an assumption with no support in the record—this fact would be irrelevant. The SEC statutory scheme and regulations do not contemplate the control of advertisements such as the one central to this case.

The question of what communications LILCO may appropriately make under SEC regulations in response to the advertisement is not before us. The only issue posed is whether LILCO can prevent Citizens from presenting its views to the general public in the form of a newspaper or other advertisement. The answer to that is clearly no.

The costs and other burdens of further discovery would constitute a serious impediment to free political discussion. A powerful coporation should not be permitted to stifle free speech by threats of costly litigation. Those with money already speak loudly through the media. To muffle the voice of the less affluent public by allowing suits such as this to go forward dangerously hobbles the public debate that is our democracy's first line of defense.

## IV. CONCLUSION

Summary judgment is granted against plaintiff. Plaintiff's action is dismissed as to all defendants. Cost and disbursements are awarded to defendants.

SO ORDERED.

# THE PROBLEM ISN'T JUST SHOREHAM. THE PROBLEM IS LILCO!

The problem isn't just whether Shoreham is safe, nor just whether hundreds of thousands of men, women and children can get off Long Island quickly and safely in case of accident . . . all legitimate fears.

The real problem is LILCO.

## LILCO'S MISMANAGEMENT

LILCO's mismanagement is staggering. It resulted in Shoreham costing 16 times more than LILCO's own estimate. What's more, the Public Service Commission ruled that "LILCO mismanaged the project" to the tune of $1.35 Billion (that's Billion!). And while wasting these billions, LILCO neglected vital services like storm damage prevention.

The Chairman of Grumman, Long Island's largest employer summed it up: *"The cost of Shoreham now threatens to destroy the economy of Long Island."*

## BUT THAT'S NOT ALL

Now LILCO wants *you* to foot the bill for their foul-ups.

Now, LILCO wants *you* to pay their $1.35 Billion mismanagement penalty.

Now, LILCO wants *you* to pay the multi-million dollar penalty they incurred when they deliberately withheld $131 million in property taxes.

And even though damages from Hurricane Gloria were aggravated by LILCO's neglect, guess who's going to be asked to pay for it!

Gov. Cuomo called LILCO's proposals a scheme to save itself at public expense. Right! In fact, LILCO wants to lock us all into their higher rates and safety problems. Forever.

Isn't there a better way?
You bet there is!

## THE BETTER WAY

Ask any resident of Rockville Centre what he or she pays for power. You'll find it's much *less than half* of what the rest of us (who are in LILCO's clutches) pay. The reason is quite simple: the village of Rockville Centre *owns the utility* that supplies it with power.

That suggests a solution for us.

## REPLACE LILCO WITH A LONG ISLAND POWER AUTHORITY

Financial experts confirm it: replacing LILCO with a Long Island Power Authority will cost a lot less than bailing LILCO out. Getting rid of LILCO will cost us less to begin with . . . and less in the long run (remember Rockville Centre).

Can it be done? State law *guarantees* the right to replace LILCO. A Long Island Power Authority is not only sensible and economical. It is do-able!

## A L.I. POWER AUTHORITY WOULD PROTECT OUR SAFETY

Here's the plain fact: LILCO's life depends on opening Shoreham—and making all of us pay for it. And this despite Shoreham's major safety problems. That's why they're spending a fortune on propaganda while we put up with terrible service.

A Long Island Power Authority would close Shoreham, keep it out of the rate base and supply dependable, *safe* power at far lower cost. Simple as that.

## A LONG ISLAND POWER AUTHORITY MEANS LOWER RATES

LILCO makes money by investing in building power plants—charging us for their cost plus their markup. In contrast, the rates of a Long Island Power Authority would be based solely on generating and delivering power. Moreover, such an Authority need pay no stockholder dividends, no income tax and would incur lower interest rates when it borrows. And more. A Long Island Power Authority would be entitled to preference in obtaining cheaper hydropower!

There's more. The L.I. Power Authority would help protect the jobs of the men and women on the line who are the real strength of any utility. And it would contribute to local governments to protect the tax base.

## LILCO, THE MANIPULATOR

LILCO has taken other steps to bamboozle us, intimidate our legislators and manipulate our local elections. They've hired California and Washington PR hotshots and are planning to spend whatever is necessary to hype us by flooding the newspapers and airwaves with their slick propaganda.

## A REAL CITIZENS COMMITTEE

Unlike those "Citizens" committees that are bought and paid-for by LILCO, there's now a real Citizen group of ratepayers. The *Citizens to Replace Lilco* is the voice of long-abused Long Islanders who've had enough of LILCO.

If you've had it with incompetence and arrogance, if you resent LILCO's attempts to take over our local governments, if you're fed up with one of the country's worst utilities—join us now! Together we will be the Long Island Power that stops the LILCO steamroller.

GOODBYE LILCO
HELLO L.I. POWER

Just Off the Press!
Our new brochure explains the benefits of replacing LILCO with our own Long Island Power Authority. Send for it now!

---

**JOIN US TODAY!**

☐ I want to join Citizens to Replace LILCO. Send me the free, detailed brochure and a bumper strip.

☐ I'm also enclosing a contribution to help carry the message to everyone.

My contribution is $_____
Name _____
Address _____
No and Street

City      Zip      Phone #

*Please make checks payable to:*
**Citizens to Replace LILCO**
137 Broadway
Amityville, N.Y. 11701

**FOR FAST ACTION
CALL (516) 598-1500**

● Maurice Barbash, General Chairman, Babylon ● Norman E. Blankman, Nassau Chairman, Port Washington

Steering Committee (In Formation) ● Nora Bredes, Smithtown ● Elaine Benson, Bridgehampton ● Leon Campo, Mt. Sinai ● Bill Chaleff, East Hampton ● Frazer Dougherty, East Hampton ● Jack Hohenberger, Northport ● Dan Gluck, Amityville ● Leonard Goldschmidt, Brightwaters ● Lou Grasso, Riverhead ● Joseph Kaufman, Bridgehampton ● Nancy Kelly, Bridgehampton ● Irving Like, Babylon ● Sharon Luscombe, Uniondale

● William Marran, Cold Spring Harbor ● William Massino, Huntington ● Edward McGovern, Stony Brook ● Arthur Metzger, Farmingdale ● Deborah Perry, Amagansett ● Nathan Pitt, Woodbury ● Clair Siegal, Patchogue ● Alex Sneddon, Southampton ● Judith Sneddon, East Hampton ● Robert Snyder, Baldwin ● Tom Twomey, Riverhead ● Dave Willmott, Riverhead